

# In the Missouri Court of Appeals
## Western District

| | |
|---|---|
| LILLIAN M. LEWELLEN, )<br>    Appellant-Respondent, )<br>v. )<br>     )<br>UNIVERSAL UNDERWRITERS )<br>INSURANCE COMPANY, et al. CHAD )<br>FRANKLIN, CHAD FRANKLIN )<br>NATIONAL AUTO SALES NORTH, LLC )<br>and CFS ENTERPRISES, INC., )<br>    Respondent-Appellant. ) | WD81171<br>Consolidated with WD81186,<br>WD81260 and WD81364<br><br>FILED: February 13, 2019 |

## APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
### THE HONORABLE TIMOTHY J. FLOOK, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### EDWARD R. ARDINI AND THOMAS N. CHAPMAN, JUDGES

This appeal and cross-appeal arises from judgments entered by the circuit

court on Lillian Lewellen's claims against Chad Franklin, Chad Franklin National

Auto Sales North, LLC, and CFS Enterprises, Inc. (collectively "Franklin")[1] and

---

[1] We will refer to Chad Franklin and the related corporate auto sales entities collectively as "Franklin," as their interests are, for purposes of this case, singular. Where it is necessary to state the name of a corporate entity to demonstrate a difference in treatment or to avoid confusion, we will refer to each by their respective designations. Similarly, we will refer to Chad Franklin individually as "Chad." No disrespect or familiarity is intended.

Universal Underwriters Insurance Company and Zurich American Insurance Company (collectively "Universal").[2]

Lewellen appeals: (1) the judgment denying insurance coverage on her claim that Franklin committed fraudulent misrepresentation in the sale of a vehicle; (2) the summary judgment in favor of Universal on her claims concerning a civil conspiracy to commit a fraudulent transfer and violations of the Missouri Merchandising Practices Act ("MMPA"); and (3) the summary judgment in favor of Universal on her claim for tortious interference with a business expectancy.

Universal cross-appeals the judgment granting insurance coverage for actual and punitive damages on Lewellen's MMPA claim. Franklin's cross-appeal alleges a series of procedural and evidentiary errors that he contends resulted from the improper striking of his pleadings after several alleged discovery violations.

For reasons explained herein, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL HISTORY**

In October of 2007, Lewellen purchased a vehicle at Franklin's car dealership during the "Drive for Life" promotion. Based on the promotion, a sales representative told Lewellen that she could purchase a vehicle and make payments of $49.00 a month for one year, at which time she could return the car and pick a new vehicle under the same payment arrangement. Lewellen signed loan

---

[2] Zurich American Insurance Company is the parent company of Universal Underwriters Insurance Company.

2

documents stating that she would be responsible for making market-rate payments for the vehicle; however, she was reassured by the sales representative that, pursuant to the promotion, Franklin would send her monthly checks to offset the difference between the $49.00 promotional price and the market rate. After the purchase, Lewellen received the offset payments from Franklin for approximately six months. She was unable to make the market-rate payments once the offset payments stopped, and her vehicle was repossessed.

In 2008, Franklin became a party to several lawsuits alleging a variety of claims and damages relating to the "Drive for Life" promotion. During this time, Franklin was insured by Universal. Universal denied defense and coverage for the claims.

On October 21, 2008, Chad and CFS Enterprises, Inc. filed suit against Universal alleging wrongful denial of their insurance defense. In December 2009, Chad and Chad Franklin National Auto Sales North filed a second lawsuit against Universal alleging bad faith. Tiffany Franklin, who at the time was Chad's wife, was also a named insured on the Universal policy and was added as a party to both lawsuits. David Mayer of the law firm Monsees, Miller, Presley, & Amick, P.C. represented all plaintiffs in these lawsuits against Universal.

On August 31, 2010, Universal, Franklin, and Tiffany Franklin agreed to a settlement that disposed of the bad faith claims against Universal. As part of the settlement, Universal agreed to make a payment of $900,000 to Chad and Tiffany Franklin. These funds were disbursed as follows: $250,000 to Fifth Third Bank,

3

$266,370.41 to Tiffany Franklin, and $383,629.59 to Mayer's law firm. The distribution to Fifth Third Bank, a secured creditor of Franklin's car dealership operation, was made pursuant to a garnishment filed against Universal. This $900,000 settlement agreement is the transfer that Lewellen would later allege was fraudulently made between Universal and Franklin.

On December 15, 2010, Lewellen filed suit against Franklin alleging fraudulent misrepresentation and violations of the MMPA. In June 2012, Lewellen was awarded $25,000 in actual damages and $1 million in punitive damages against Chad individually for his fraudulent misrepresentation, and $25,000 in actual damages and $500,000 in punitive damages against Chad Franklin National Auto Sales North, LLC for a violation of the MMPA.[3] Lewellen was also awarded attorneys' fees totaling $82,810.00.

In April 2013, Lewellen filed the instant action against Universal and Franklin. In Counts I and II of her third amended petition, Lewellen asserted equitable garnishment and declaratory judgment claims against Universal seeking insurance coverage for the judgment against Chad and Chad Franklin National Auto Sales North on her fraudulent misrepresentation and MMPA claims. In Counts III through VII, Lewellen asserted claims of fraudulent transfer, MMPA violations, civil conspiracy, joint venture/joint enterprise, and a bill in equity against Universal and

---

[3] The circuit court subsequently reduced the punitive damages award to $500,000, but the Supreme Court of Missouri vacated the reduction and reinstated the $1 million award. *See Lewellen v. Franklin*, 441 S.W.3d 136, 150-51 (Mo. banc 2014) ("*Lewellen 1*")

4

Franklin based upon their August 2010 settlement agreement. In Count VIII, Lewellen asserted a claim of tortious interference with a business expectation against Universal. [4]

The court held a bench trial on Counts I and II of Lewellen's third amended petition. Count I alleged an equitable garnishment claim against Universal in which she sought coverage for the judgment against Chad and Chad Franklin National Auto Sales North on her fraudulent misrepresentation and MMPA claims. Count II requested a judgment declaring that Franklin's insurance policy with Universal applied to Lewellen's judgment and damages. The court declined to reach Count II and entered judgment on Count I finding that Lewellen's fraudulent misrepresentation claim was not entitled to coverage, but that her MMPA claim was covered under Franklin's policy with Universal.

In March 2017, the court granted summary judgment in favor of Universal on Counts III through VIII. Discovery proceeded on Lewellen's claims against Franklin. After Chad failed to appear for his deposition, the court struck Franklin's responsive pleadings and entered a default judgment in Lewellen's favor on the fraudulent transfer and MMPA claims. During a subsequent trial on damages, the jury awarded Lewellen $266,370.41 in actual damages and $450,000 in punitive damages on each of her two claims. The punitive damages were divided among the defendants: Chad was assessed $250,000 ($500,000 total) individually, while

---

[4] In 2014, based on the similarity of claims, the circuit court consolidated Lewellen's underlying action with *Overbey v. Universal*, 11CY-CV03955, for purposes of discovery.

Chad Franklin National Auto Sales North and CFS Enterprises were each assessed $100,000 ($200,000 total). The court merged the actual damages on the two claims but granted the total amount of punitive damages and awarded Lewellen $189,060 in attorneys' fees. Lewellen appeals. Franklin and Universal cross-appeal.

ANALYSIS

I.     **Equitable Garnishment Judgment**

Both Lewellen and Universal challenge the equitable garnishment judgment in several of their points on appeal. Lewellen contends the court erred in denying insurance coverage for the damages awarded on her fraudulent misrepresentation claim, while Universal contends the court erred in allowing coverage for the damages awarded to Lewellen on her MMPA claim.

   **A.**     **Standard of Review**

In determining whether Universal's policy affords coverage for the damages awarded Lewellen, we interpret the insurance policy *de novo*. *Swadley v. Shelter Mut. Ins. Co.*, 513 S.W.3d 355, 357 (Mo. banc 2017). Our review of factual determinations made by the circuit court, however, are reviewed under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Vill. at Deer Creek Homeowners Ass'n Inc. v. Mid-Continent Cas. Co.*, 432 S.W.3d 231, 239 (Mo. App. 2014). Thus, we will affirm the circuit court's judgment "unless there is no substantial evidence to support it or unless it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies

6

the law." *Schmitz v. Great Am. Assurance Co.*, 337 S.W.3d 700, 705 (Mo. banc 2011). We "must view the evidence in a light most favorable to the judgment and disregard all contrary evidence and permissible inferences." *Rissler v. Heinzler*, 316 S.W.3d 533, 536 (Mo. App. 2010).

In reviewing the language contained in insurance policies, we apply the meaning of the terms that "would be attached by an ordinary person of average understanding if purchasing insurance," *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007) (internal citation and quotations omitted), and we will interpret the contract "as to afford coverage rather than defeat" it. *Universal Underwriters Ins. Co. v. Dean Johnson Ford, Inc.*, 905 S.W.2d 529, 533 (Mo. App. 1995). Where no ambiguity exists, we will enforce the contract according to its terms. *Swadley*, 513 S.W.3d at 357. However, if we find an ambiguity within the policy, we will resolve that ambiguity against the insurer. *Id.*

"An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Id.* (internal citation and quotations omitted). Further, we do not review each provision of a policy in isolation but instead evaluate the policy as a whole. *Seeck*, 212 S.W.3d at 133.

### B. Coverage for Fraudulent Misrepresentation Claim

#### i. The fraud and dishonest act exclusion is not ambiguous.

In Point I, Lewellen contends the circuit court erred in denying insurance coverage for the damages awarded to her and against Franklin on her claim of

fraudulent misrepresentation.  She asserts that the insurance policy exclusion concerning dishonest and fraudulent acts is ambiguous and should be construed against the insurer, Universal, to provide coverage for the damages award.[5]

The exclusion at issue states: "This insurance does not apply to: (a) INJURY, EMPLOYMENT RELATED DEFENSE, COVERED POLLUTION DAMAGES, CUSTOMER COMPLAINT DEFENSE, or STATUTE AND TITLE E&O, if caused by any dishonest, fraudulent or criminal acts committed by any INSURED."[6]  Lewellen alleges that the words "dishonest" and "fraudulent" create an ambiguity because the terms serve to include several forms of conduct, some intentional and others unintentional.  The policy does not confer any special definition to these terms; therefore, we may look to the dictionary definition of the terms to illuminate our

---

[5] In its cross-appeal, Universal argues that no evidence of any ambiguity should have been allowed because Lewellen failed to plead ambiguity as grounds for relief.  Rule 55.05 states, in pertinent part:

> A pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain (1) a short and plain statement of the facts showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the pleader claims to be entitled.

Universal cites no support that directly addresses the issue of pleading ambiguity and, instead, directs our attention to *Williams v. Barnes & Noble, Inc.*, 174 S.W.3d 556 (Mo. App. 2005).  In *Williams*, we reiterated that "[t]he failure to plead facts showing entitlement to the relief sought deprives the trial court of jurisdiction to grant it."  174 S.W.3d at 559.  However, this case does not involve a failure to plead facts that demonstrate entitlement to relief.  Lewellen pled that she was entitled to relief on her claims of equitable garnishment because the insurance policy issued by Universal extended coverage to her claims.  Ambiguity is a legal argument among the panoply of issues presented within such a claim; therefore, Rule 55.05 does not act to exclude any evidence of ambiguity.  Moreover, the ambiguity argument was raised in response to Universal's claim that an exclusion to the policy justified the denial of coverage.  Universal's Point IV is denied.

[6] The exclusion cited by Lewellen is contained in Coverage Part 500, which governs Garage Operations and Auto Hazards as defined by that section.  There is also, however, a dishonest acts exception in Coverage Parts 970 and 980, which are umbrella policies.

8

path. *Strader v. Progressive Ins.*, 230 S.W.3d 621, 624 (Mo. App. 2007). "Dishonest" is defined as "characterized by lack of truth, honesty, probity, or untrustworthiness, or by an inclination to mislead, lie, cheat, or defraud." *Dishonest*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 650 (1993). "Fraudulent" is defined as "belonging to or characterized by fraud[,]" *Fraudulent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 904, with "fraud" defined as "an instance or an act of trickery or deceit esp[ecially] when involving misrepresentation." *Fraud*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 904.

Applying dictionary definitions of the terms "dishonest" and "fraudulent" to the language of the exclusion, we find no ambiguity. An ordinary person of average understanding would clearly understand that purchasing this policy would not protect against acts that were designed to mislead, perpetrate a fraud, or those involving trickery, deceit, or misrepresentation. *See Seeck*, 212 S.W.3d at 132. Lewellen attempts to create an ambiguity where none exists.

Lewellen's reliance on *Dean Johnson*, to demonstrate that the fraud exclusion is ambiguous is similarly misplaced. In *Dean Johnson*, we reviewed a grant of summary judgment for the insurer concerning the relationship between two policy clauses—one that set forth the insurer's duty to defend the insured, and another that the insurer said removed that same obligation. 905 S.W.2d at 533-34. We found the fraud exclusion in that case, which is similar to the one at issue in this case, to be ambiguous with respect to the insurer's duty to defend. *Id.* at 534-35. We did not find that the fraud exclusion was ambiguous in its exclusion

9

of coverage for damages assessed against an insured, however. *Id.* In fact, we specifically stated:

> A more reasonable interpretation, and one which gives effect to both the exclusion and the provisions for defense costs for Legal Damages and for Product Related Damages, is that the *exclusion simply excluded coverage for damages actually awarded against the insured for acts proved to be intentionally dishonest or fraudulent*.

*Id.* (emphasis added). Lewellen's Point I is denied.

### ii. The definition of "occurrence" does not provide insurance coverage for damages on Lewellen's fraudulent misrepresentation claim.

In Point II, Lewellen further contends the circuit court erred in denying insurance coverage for the damages awarded against Franklin on her claim of fraudulent misrepresentation. In this point, she makes a series of arguments in an attempt to demonstrate that the previously-discussed fraud exclusion, and a different exclusion for acts committed with the intent to cause harm, do not apply to Franklin's conduct. Before reaching the fraud and intent exclusions, however, we must first decide whether the definition of "occurrence" contained in the insuring agreement provides coverage for the damages awarded on Lewellen's fraudulent misrepresentation claim.

As a threshold matter, both parties allege that the other has the burden to demonstrate the applicability of the "occurrence" clause of the policy to the instant conduct. Because the operation of the "occurrence" language and its applicability to the conduct at issue presents a question of coverage, and not one of exclusion, it is well-settled that the party seeking coverage—here, Lewellen—has the burden

10

to prove that Franklin's conduct is covered under the "occurrence" clause contained within the policy. *Universal Reins. Corp. v. Greenleaf*, 824 S.W.2d 80, 83 (Mo. App. 1992). If we must reach the policy exclusions, however, it is an equally well-settled proposition that the burden of demonstrating that an exclusion applies to bar coverage is one carried by the insurer. *Manner v. Schiermeier*, 393 S.W.3d 58, 62 (Mo. banc 2013).

The insuring agreement in Coverage Part 500 states, in pertinent part: "WE will pay all sums the INSURED legally must pay as DAMAGES (including punitive DAMAGES where insurable by law) because of INJURY to which this insurance applies caused by an OCCURRENCE arising out of GARAGE OPERATIONS or AUTO HAZARD."[7] At issue in this point is the definition of "occurrence," which is defined later in the same Coverage Part as "an accident, including continuous or repeated exposure to conditions, which results in such INJURY or COVERED POLLUTION DAMAGES during the Coverage Part period neither intended nor expected from the standpoint of a reasonably prudent person."

As the term "accident" is not defined in Coverage Part 500, we must look elsewhere for its meaning. "[W]hen a liability policy defines occurrence as meaning accident, Missouri courts consider this to mean injury caused by the negligence of the insured." *Vill. at Deer Creek*, 432 S.W.3d at 246 (internal citations and quotations omitted). Further, courts have stated that an "accident" does not

---

[7] A subsequent amendment referred to as the "Missouri Amendment" struck the language concerning punitive damages.

11

necessarily have to be the result of a sudden event; it can be the result of a process. *Columbia Mut. Ins. Co. v. Epstein*, 239 S.W.3d 667, 672 (Mo. App. 2007). "The determinative inquiry into whether there was an 'occurrence' or 'accident' is whether *the insured* foresaw or expected the injury or damages." *D.R. Sherry Constr., Ltd., Am. v. Family Mut. Ins. Co.*, 316 S.W.3d 899, 905 (Mo. banc 2010) (emphasis added). However, in reviewing the insured's foresight of these injuries we employ an objective standard—whether a reasonably prudent person would foresee this accident—instead of an analysis of Franklin's subjective intent or expectation. *Truck Ins. Exch. v. Pickering*, 642 S.W.2d 113, 116 (Mo. App. 1982).

Prior to answering this question, we must clear the parties' apparent confusion about the evidence presented at the jury trial against Franklin and during the equitable garnishment bench trial. In the fraudulent misrepresentation action, the court struck Franklin's pleadings and entered an interlocutory default judgment in Lewellen's favor.[8] Lewellen now alleges that this default judgment decided liability but did not make any finding as to whether Franklin's conduct was that of an intentional or negligent tort. However, an interlocutory judgment of default "admits the traversable allegations in the petition constituting the plaintiff's cause of action and the defendant's liability thereunder[.]" *Beckmann v. Miceli Homes, Inc.*, 45 S.W.3d 533, 541 (Mo. App. 2001). Further, a default judgment entered

---

[8] For the sake of clarity, we note that the discovery violation and striking of pleadings at issue in this point does not refer to the discovery violations and sanctions discussed, *infra*.

12

as a response to a discovery violation, as occurred here, is not a "true default judgment" and is, instead, "treated as a judgment upon trial by the court." *Norber v. Marcotte*, 134 S.W.3d 651, 662 (Mo. App. 2004) (internal citations and quotations omitted).

In a subsequent equitable garnishment proceeding, this judgment can have a preclusive effect that cannot be collaterally attacked if the party had the opportunity to control the litigation, the court issuing judgment had subject-matter jurisdiction, and the judgment is not void on its face. *Assurance Co. of Am. v. Secura Ins. Co.*, 384 S.W.3d 224, 232 (Mo. App. 2012). The Supreme Court of Missouri described this preclusive effect, stating:

> [T]he first judgment is conclusive on the plaintiff and defendant, and hence the garnishee, as to defendant's liability to plaintiff on the tort cause of action in the amount of the verdict rendered. Nevertheless, the judgment in the tort action is not conclusive on the parties in the garnishment suit as to facts not actually litigated in the first action or to facts that were merely evidentiary or . . . inferentially involved in the first.

*Allen v. Bryers*, 512 S.W.3d 17, 33 (Mo. banc 2016) (alteration in original) (quoting *Drennen v. Wren*, 416 S.W.2d 229, 234 (Mo. App. 1967)). Further, and perhaps more importantly, the "underlying judgment is conclusive in a later action on the indemnity contract as to those issues and questions necessarily determined in the underlying judgment." *Id.* (internal citation and quotations omitted).

Here, the interlocutory default entered against Franklin was a judgment upon trial by the court admitting the traversable elements of fraudulent misrepresentation. Even if we were to accept Lewellen's argument that she

13

pleaded both intentional and negligent versions of this tort and the judgment left both open for use, she has plainly chosen to advance the theory of an intentional act. During the underlying trial, Lewellen offered punitive damage instructions that were modeled off of Missouri Approved Instruction ("MAI") 10.01—the instruction charging punitive damages for *intentional torts*. *See* Notes on Use [2008 Revision] to MAI 10.01 ("Where the claim for actual damages is submitted on negligence as opposed to an intentional tort, MAI 10.01 is not applicable; use MAI 10.02 or MAI 10.07, whichever is appropriate."); *see also Sharp v. Robberson*, 495 S.W.2d 394, 399 (Mo. banc 1973). Further, Universal provided the court with evidence supporting its contention that Lewellen had argued, in the underlying trial, that Franklin *intended* to defraud her.[9] Although the interlocutory entry of default took the question of liability from the jury and, therefore, limited what facts were necessary to the jury's finding, the court's judgment concerning liability and Lewellen's subsequent litigation strategy during the damages portion made Franklin's intentionality a material and necessary fact to the judgment. It was only during the equitable garnishment proceeding, when it became clear that asserting an intentional tort would harm her interests, that Lewellen reasserted her negligence claim.

---

[9] Lewellen contends that Universal offered the circuit court a stack of papers and failed to provide designations of relevant portions of the transcript. Indeed, the circuit court told Universal it would not comb through the record without assistance. Universal made the designations prior to closing, however, and offered its proposed findings of fact and law as the circuit court requested.

As an occurrence is an accident, defined as an injury caused by the negligence of the insured that was neither intended nor expected, and we have determined that Franklin acted intentionally, we find that the insurance policy does not provide coverage for Lewellen's fraudulent misrepresentation claim. "When an intentional act results in injuries which are the natural and probable consequences of the act, the injuries as well as the act are intentional." *Pickering*, 642 S.W.2d at 116. When Franklin intentionally completed the fraudulent misrepresentation, it was a natural and probable consequence that Lewellen would suffer the type of injury that ultimately occurred. Because we have found that the fraudulent misrepresentation claim is categorically denied coverage because it is not an "occurrence," we need not reach Lewellen's arguments concerning the applicability of other exclusions. Lewellen's Point II is denied.

### C.    Coverage for MMPA Claim / Concurrent Proximate Cause Rule

In Universal's Points I and II, Universal contends the circuit court erred in finding Franklin's policy covers Lewellen's MMPA claim. Universal asserts that the fraud exception should prevent coverage under Coverage Part 500 and the policy definition of occurrence should prevent coverage under Coverage Parts 970 and 980. In Point III, Lewellen asserts that, not only does Franklin's policy afford coverage to her MMPA claim, but the coverage of that claim triggers the concurrent proximate cause rule granting coverage to her extinguished fraudulent misrepresentation claim.

Coverage Part 970 and 980 states:

15

WE will pay for LOSS, subject to the terms and conditions of this Coverage Part, in excess of

(a) coverage provided in any UNDERLYING INSURANCE;

(b) coverage provided to an INSURED in any other insurance;

(c) in the absence of (a) or (b) the retention shown in the declarations.

Loss is defined as "all sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies caused by an OCCURRENCE." The definition of occurrence applicable to Lewellen's claims is the same definition as the one contained in Coverage Part 500. Further, the conduct underlying the fraudulent misrepresentation and MMPA claim is the same conduct. As we have previously found Franklin's actions were intentional and, therefore, not occurrences, we find the same for the MMPA claims. No coverage is extended under Coverage Parts 970 and 980. Universal's Point II is granted.

That does not end the inquiry, however. It is unclear whether Lewellen seeks coverage for her MMPA claim under the clause for "customer complaint defense" or "statute and title E&O" contained in Coverage Part 500. Coverage Part 500 defines "customer complaint defense" as "any SUIT filed against YOU during the Coverage Part period by or on behalf of a customer arising out of the sale, lease, rental, service or repair of YOUR PRODUCT, other than as a direct result of an OCCURRENCE or as defined in STATUTE AND TITLE E&O." As for Statute and Title E&O, Coverage Part 500 states, in pertinent part: "WE will pay all sums the INSURED legally must pay as DAMAGES (including punitive DAMAGES

16

where insurable by law) because of STATUTE AND TITLE E&O when such insurance is included in the declarations." Statute and Title E&O is defined as:

> any claim or SUIT filed against YOU, other than as a result of an OCCURRENCE or CUSTOMER COMPLAINT DEFENSE, by or on behalf of:
>
> (a) a customer arising out of GARAGE OPERATIONS, because of an alleged violation during the Coverage Part period, of any federal, state, or local:
>
>   (1) odometer law;
>   (2) truth-in-lending or truth-in-leasing law;
>   (3) auto damage disclosure law;
>   (4) competitive auto parts law;
>   (5) used car "Buyers Guide," including federal regulation 455;
>
> (b) any person or organization who has suffered a financial loss due to the failure of YOUR employee, to properly specify during the Coverage Part period, the name of the security interest or "legal owner" on auto title papers . . .

It is clear that Lewellen's claim, if it were covered, would be included in one of these sections of Franklin's insurance contract with Universal. Regardless of which section ultimately applies, the claim is still governed by the exceptions to the policy that we have discussed *supra*. As we previously determined that Franklin engaged in an intentional, fraudulent tort, we now find that this conduct is specifically contemplated by Exclusion (a), which states "This insurance does not apply to: (a) INJURY, EMPLOYMENT RELATED DEFENSE, COVERED POLLUTION DAMAGES, CUSTOMER COMPLAINT DEFENSE, or STATUTE AND TITLE E&O, if caused by any dishonest, fraudulent or criminal acts committed by any INSURED." Therefore, no coverage is extended to Lewellen's MMPA claim. Universal's Point I

17

is granted, and the equitable garnishment judgment in favor of Lewellen on the MMPA claim is reversed.

Finally, as we have found that neither claim is to be afforded coverage under Universal's policy, we must also find that the concurrent proximate cause rule does not apply to Lewellen's claims. "The concurrent proximate cause rule states that an insurance policy will be construed to provide coverage where an injury was proximately caused by two events—even if one of these events was subject to an exclusion clause—if the differing allegations of causation are independent and distinct." *Am. Family Mut. Ins. Co. v. Parnell*, 478 S.W.3d 489, 492 (Mo. App. 2015) (internal citations and quotations omitted). Because no coverage exists for Lewellen's claims, the rule cannot be used to save either discrete claim. *See id.* Lewellen's Point III is denied.

### D.    Coverage for Punitive Damages

As we have held that Franklin, and therefore Lewellen, is not entitled to coverage for damages for either the fraudulent misrepresentation or MMPA claim, we need not further consider Universal's Point III regarding the insurability of punitive damage awards.[10] The judgment finding coverage for actual and punitive damages awarded on Lewellen's MMPA claim is reversed.

---

[10] It is important to note that the discussion concerning the definition of occurrence and its exclusion of coverage, *supra*, applies to the use of occurrence in Coverage Parts 970 and 980 preventing coverage under those policy components.

18

**II.   Summary Judgment Claims in Favor of Universal**

In several points, Lewellen challenges the court's summary judgment ruling in favor of Universal that denied her claims of civil conspiracy to commit fraudulent transfer, civil conspiracy to violate the MMPA, and tortious interference with a business expectancy.

**A.   Standard of Review**

Our review of an entry of summary judgment is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review "the record in the light most favorable to the party against whom summary judgment is entered and accord the non-movant the benefit of all reasonable inferences from the record." *Peck v. All. Gen. Ins. Co.*, 998 S.W.2d 71, 74 (Mo. App. 1999). However, we will regard as true any fact set forth in support of the summary judgment unless contradicted by the response from the party opposing summary judgment. *ITT*, 854 S.W.2d at 376.

Summary judgment is appropriate only when there is no "genuine issue as to any material fact" and the movant demonstrates they are entitled to judgment as a matter of law. Rule 74.04(c). A defendant demonstrates an entitlement to summary judgment by showing:

> (1) facts negating any one of the claimant's elements necessary for judgment; (2) that the claimant, after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the claimant's elements; or (3) facts necessary to support his properly pleaded affirmative defense.

19

*Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo. banc 2013). We will affirm a summary judgment on any theory supported by the record. *Id.*

## B.    Civil Conspiracy Claims

In Point IV, Lewellen contends the circuit court erred in granting Universal's motion for summary judgment on Count V, in which she alleged that Universal engaged in a civil conspiracy to commit a fraudulent transfer with Franklin. The court ruled, in part, that the "[f]acts that may cause the bad faith settlement payments to Tiffany Franklin to appear suspicious (or even if arguably fraudulent) do not offset the lien requirement necessary to state a claim for civil conspiracy." Lewellen argues that Universal was not entitled to the judgment as a matter of law because Missouri law does not require her to secure a lien on the transferred funds as a condition precedent for a finding that a fraudulent transfer occurred.

"A 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act." *8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 451 (Mo. App. 2009) (internal citations and quotations omitted). Civil conspiracy is not an individual cause of action, instead it extends joint and several liability to coconspirators for the underlying act. *Id.* "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." *Royster v. Baker*, 365 S.W.2d 496, 499 (Mo. 1963).

Lewellen asserts that the Missouri Uniform Fraudulent Transfer Act ("UFTA") removed the common law rule that a lien was a condition precedent for standing to

20

maintain a lawsuit against a third party. We acknowledged this common law requirement in *Mark VII, Inc. v. Barthol*, 926 S.W.2d 128, 131 (Mo. App. 1996), stating: "[T]he general rule is that without a lien, a mere general creditor does not have a sufficient right or interest in his debtor's property to give him standing to maintain a suit against a third person converting the debtor's property with the intent to defraud the debtor's creditors."

The UFTA created a statutory cause of action that provided specific equitable remedies for creditors invoking its sections. At issue in this case is the section governing "transfers fraudulent as to present and future creditors," which states, in pertinent part:

> 1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

§ 428.024, RSMo Cum. Supp. 2016.[11]  A claim is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  § 428.009.  Lewellen contends that our decision in *Mark VII* predates the enactment of the UFTA and, therefore, the common law has been modified by subsection 1 of Section 428.024 to remove the lien requirement.  It appears that this UFTA interpretation is a matter of first impression in Missouri and, as such, we look to other jurisdictions that have confronted this issue.[12]

Lewellen asserts that Missouri already implicitly follows the minority view, which holds that the UFTA modifies the "common law rule so that, even without a lien, a transfer to defeat a creditor who has filed a claim nevertheless constitutes a legal wrong and an underlying cause of action for a conspiracy claim."  *Double Oak Const., L.L.C. v. Cornerstone Dev. Int'l*, 97 P.3d 140, 146 (Colo. App. 2003); *see also Dalton v. Meister*, 239 N.W.2d 9, 18-19 (Wis. 1976); *McElhanon v. Hing*, 728 P.2d 256, 262-63 (Ariz. Ct. App. 1985), *vacated on other grounds by* 728 P.2d 273, 283 (1986); *Summers v. Hagen*, 852 P.2d 1165, 1169-70 (Alaska 1993). Courts in jurisdictions following the minority rule have noted that the lien requirement frustrates the policy behind the adoption of the UFTA because it

---

[11] All statutory references are to the Revised Statutes of Missouri 2016.

[12] The language at issue in Lewellen's point on appeal is from the Uniform Fraudulent Transfer Act, which has been adopted by many states in substantially the same form.

provides creditors limited relief and allows debtors to escape claims through attrition. *See Double Oak*, 97 P.3d at 146-47.

The majority of jurisdictions, however, hold that the UFTA only provides for equitable remedies against *transferees* and claims of civil conspiracy "[do] not expand the remedies afforded by UFTA." *Forum Ins. Co. v. Devere Ltd.*, 151 F. Supp. 2d 1145, 1148-50 (C.D. Cal 2001), *aff'd in part, rev'd in part sub nom. Forum Ins. Co. v. Comparet*, 62 F. App'x. 151, 153 (9th Cir. 2003) (allowing conspiracy for fraudulent transfer to continue under a different tort theory authorized by California law); *see Summer*, 852 P.2d at 1169 (supporting proposition that this is the majority rule); *see also Van Royen v. Lacey*, 277 A.2d 13, 16 (Md. 1971) (adopting majority rule and specifically stating inchoate interest was insufficient to maintain suit for conspiracy to defraud); *but see Qwest Commc'ns Corp. v. Weisz*, 278 F. Supp. 2d 1188, 1192-93 (S.D. Cal. 2003) (holding that the UFTA extends beyond transferees and is capable of supporting a conspiracy theory of liability).[13]

The remedies contemplated by the Missouri UFTA are:

1. In an action for relief against a transfer or obligation under sections 428.005 to 428.059, a creditor, subject to the limitations in section 428.044, may obtain:

---

[13] Several courts interpreting the *Qwest* decision have stated that it is against the weight of precedent and misinterprets the UFTA. *See Renda v. Nevarez*, 167 Cal. Rptr. 3d 874, 877 n.2 (Cal. Ct. App. 2014) ("Any suggestion in Qwest that a debtor is subject to a money judgment under section 3439.08, subdivision (b)(1) is therefore nonbinding dictum."); *see also In re Javedanfar*, No. 2:13-bk-27702-ER, 2017 WL 2303907, *8 (Bankr. C.D. Cal. May 25, 2017) (The *Quest* [sic] court assumed, without analysis, that a fraudulent transfer claim sounds in tort. *Qwest* is contrary to the vast weight of authority, which holds that fraudulent transfer claims are not based in tort. . . . The Court declines to follow *Quest* [sic].");

23

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable laws of this state;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

    (a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

    (b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

    (c) Any other relief the circumstances may require.

2. If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

§ 428.039. The remedies of the UFTA are equitable in nature and plainly do not include a suit against a third party based on the co-conspirator theory of civil liability for legal remedies. *Cf. Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984) (stating that "[t]he Texas statute does not purport to do anything other than render the transfer 'void' with respect to designated persons . . . Nowhere does it purport to prohibit any transfers or to render the making or receiving of them illegal or wrongful.")

States following the minority rule, however, focus on the supplementary provisions clause contained in the UFTA, which Missouri has adopted and enshrined in Section 428.054. This section states: "[u]nless displaced by the

24

provisions of sections 428.005 to 428.059, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions." § 428.054. Colorado courts have asserted that this section preserves common law remedies and extends them to parties under the UFTA. *Double Oak*, 97 P.3d at 148. However, no court has specifically decided whether this supplementary clause preserves the lien requirement as a principle of law.

Lewellen contends that, although no Missouri case has directly stated the lien requirement has been displaced by the UFTA, the revocation of the common law rule was implied by several cases. In *Volk Const. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 901 (Mo. App. 2001), we affirmed the circuit court's award of punitive damages on a claim brought under the UFTA. Lewellen asserts that the award of punitive damages demonstrates that we adopted legal remedies for this claim implicitly following Colorado's expansive interpretation. In affirming the award, the Eastern District of this court focused on the language of Section 428.039, centering on subsection (3)(c), which states: "[A] creditor . . . may obtain . . . [s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure, [a]*ny other relief the circumstances may require*." (Emphasis added); *see Volk*, 58 S.W.3d at 900. The *Volk* court stated that the italicized portion, *supra*, "does not evidence an intent to prohibit punitive damage awards. Instead, it expressly grants courts the authority to employ the full

25

array of remedial measures insofar as they are warranted under the particular facts of the case." *Volk*, 58 S.W.3d at 900. Lewellen's contention that this award of punitive damages constitutes a legal remedy, however, is not entirely accurate, as courts sitting in equity are not prohibited from awarding punitive damages. *See Gould v. Starr*, 558 S.W.2d 755, 771 (Mo App. 1977).

Lewellen also asserts that the silence of Missouri courts on whether a lien is still required after enactment of the UFTA is evidence that Missouri has adopted the minority position. First, Lewellen directs our attention to *Higgins v. Ferrari*, 474 S.W.3d 630 (Mo. App. 2015), noting that we never mentioned a lien was necessary to support a cause of civil conspiracy in that case. This argument ignores the fact that the parties in *Higgins* did not ask this court to address whether a lien was necessary. *Id.* at 635-43. More precisely, we were not asked to address whether a suit for damages could proceed under the UFTA against a third party, as the parties in *Higgins* were just seeking to set aside transfers. Instead, the *Higgins* court focused on the badges of fraud analysis prescribed by the UFTA. *Id.* at 636-39.

Second, Lewellen urges that our silence concerning the existence of a lien as a condition precedent in *Fischer v. Brancato*, 147 S.W.3d 794, 800 (Mo. App. 2004), disposes of this point in her favor. In *Fischer*, however, the plaintiff was seeking relief under the UFTA against the debtor for a *previously imposed judgment lien*. *Id.* at 796. The UFTA enforcement suit was necessary because the defendant had funneled his employment proceeds through two incorporated alter

26

egos and to his wife to escape the pre-existing lien. *Id.* at 799-800. The *Fischer* court did not allow a disconnected suit for legal remedies, but stated that the UFTA required that any funds fraudulently transferred after the judgment lien was enforceable be transferred back to the debtor to allow the creditor to reach them. *Id.* at 801. This is a remedy specifically contemplated by Section 428.039.

Third, Lewellen asserts that the Eastern District's decision in *8000 Maryland*, forecloses any holding that the lien rule is still in effect. In *8000 Maryland*, Huntleigh Financial Services, Inc. ("HFS") began experiencing financial difficulties due to lease obligations it was no longer able to afford. 292 S.W.3d at 444. In response to these difficulties, HFS told the owner of the leased property that it was currently unable to make the required rent payments. *Id.* The property owner informed HFS that it would exercise the rights afforded to it by the lease if HFS defaulted on its terms. *Id.* A few months after this exchange, HFS sold its interests in four subsidiaries to HFS's parent entity, Longrow Holdings, Inc. *Id.* A lawsuit by the lease owner pursuant to the terms of the lease followed immediately. *Id.* The *8000 Maryland* opinion is silent as to whether the lease owner had secured a lien on the interests; however, a consent judgment did exist between the parties prior to the UFTA suit. *Id.*

We affirmed a $2,000,000 judgment against Longrow, the transferee involved in the fraudulent transfer at issue. *Id.* at 452. In doing so, we stated that Section 428.044.2, allows a court to enter money judgments against certain individuals involved in fraudulent transfers. *Id.* at 450-51. § 428.044.2 states:

27

Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under subdivision (1) of subsection 1 of section 428.039, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3 of this section or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) *The first transferee of the asset or the person for whose benefit the transfer was made*; or

(2) *Any subsequent transferee* other than a good-faith transferee who took for value or from any subsequent transferee.

(Emphasis added). The holding of *8000 Maryland* does not support Lewellen's contention that the UFTA expanded the available remedies to include legal damages and the creation of an action for civil conspiracy against a third party. Longrow was not a third-party participant in the transfer but, instead, was the transferee in receipt of the fraudulently transferred funds. *8000 Maryland*, 292 S.W.3d at 444. The UFTA specifically allows a court to enter a judgment for monetary damages against transferees for the value of the asset transferred.[14] § 428.044.2. Money damages awarded under that section are not predicated on a separate cause of action; rather, money damages are a single remedy amongst many from which the circuit court can choose. Lewellen asks that we hold that the UFTA creates a new cause of action against a third party. We decline to create that remedy absent the necessary statutory authority.

---

[14] The judgment for the value of the asset transferred "must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." § 428.044.3.

28

The *Mark VII* holding stands, and we now explicitly join the majority of jurisdictions in finding that, absent a proper lien, a claim of civil conspiracy against a third party cannot be maintained under the UFTA. The UFTA prescribes a suite of equitable remedies, and the circuit court is afforded substantial discretion in fashioning those remedies to each situation before it. Those remedies do not include Lewellen's suit as currently constructed against Universal. Out of an abundance of caution and for the sake of clarity, we reiterate that the discussion, *supra*, applies only to a claim of *civil conspiracy* to commit a fraudulent transfer. There are undoubtedly several ways in which Lewellen could have structured her claim to warrant the award of monetary damages or to cause the voidance of the transfer between Universal and the Franklins if the transfer, was in fact, fraudulent. These potential statutory remedies prescribed by the UFTA are not limited by our holding in this point. Instead, we find that the issue presented by Lewellen on this point is one of cause of action and remedy mismatch. Put another way, Lewellen sought a remedy precluded by her cause of action *unless and until she was able to present evidence of a valid lien*. As she did not present evidence of a lien, she did not carry her burden as to the civil conspiracy action and is, therefore, unable to receive the benefit of the remedy she sought before the circuit court. Lewellen's Point IV is denied.

Because of our holding on this point, we need not address Lewellen's additional allegations of error concerning the entry of summary judgment on her

29

civil conspiracy claim that she raises in her Points V and VI.  Those points are

denied.

### C. Tortious Interference with a Business Expectancy

In Point VII, Lewellen contends the circuit court erred in granting Universal's

motion for summary judgment on Count VIII, in which Lewellen alleged Universal

tortiously interfered with a business expectancy.  Lewellen asserts that there was

evidence to support: (1) a business relationship or expectancy and; (2) the absence

of justification.

> We have previously stated:
> The elements of a cause of action for tortious interference with a
> business expectancy or relationship are: (1) a contract or valid
> business relationship or expectancy; (2) the defendant's knowledge of
> the relationship or contract; (3) intentional interference by the
> defendant causing or inducing a breach of the contract or relationship;
> (4) the absence of justification; and (5) damages resulting from the
> conduct of the defendant.

*Hertz Corp. v. RAKS Hosp., Inc.*, 196 S.W.3d 536, 549 (Mo. App. 2006).

Lewellen contends that her judgment against Franklin constituted a valid

business relationship or expectancy.  In support, she cites *Stehno v. Sprint

Spectrum*, 186 S.W.3d 247, 251 (Mo. banc 2006), in which the Supreme Court of

Missouri stated: "A probable future business relationship that gives rise to a

reasonable expectancy of financial benefit is enough [to satisfy the business

expectancy element of tortious interference]".

In ruling on Universal's motion for summary judgment, the circuit court

stated that Lewellen had failed to cite any "legal authority for the argument that a

30

plaintiff in a law suit possesses 'a valid business expectancy' in the future collection of a judgment either before or after a judgment is entered[.]"  On appeal, Lewellen has not remedied this lack of legal authority to support her argument.  She continues to state, without any authority, that a judgment creates a "reasonable expectancy of a financial benefit."  Even if we were to take that statement as true, it does not provide an answer as to how a judgment can constitute "a probable future *business* relationship" as contemplated by *Stehno. See id.* (emphasis added).  Lewellen's Point VII is denied.

## III.    Franklin's Appeal

In his six points on appeal, Franklin challenges the discovery sanctions imposed against him and the entry of an interlocutory default judgment in Lewellen's favor.  He also alleges instructional and evidentiary errors, error in the denial of his motion for a directed verdict, and error in the court's failure to merge the punitive damages awards.

### A.    Sanctions

In Point I, Franklin contends the circuit court erred in striking his responsive pleadings and entering an interlocutory order of default in favor of Lewellen.  Franklin asserts that these sanctions were an abuse of discretion because there were other sanctions available to the court, and Lewellen was not prejudiced by Chad's failure to appear at the scheduled deposition.

The circuit court is vested with "broad discretion in administering the rules of discovery and in determining the proper remedy—including sanctions—for a party's

non-compliance with the rules of discovery." *Frontenac Bank v. GB Inv.*, 528 S.W.3d 381, 390 (Mo. App. 2017). Our "[r]eview is limited to determining whether the [circuit] court could have reasonably concluded as it did, not whether [we] would have imposed the same sanctions under the same circumstances." *Karolat v. Karolat*, 151 S.W.3d 852, 857 (Mo. App. 2004). Additionally, we will not disturb the circuit court's imposition of discovery sanctions unless we find the court abused its discretion. *Stockmann v. Frank*, 239 S.W.3d 650, 655 (Mo. App. 2007). "A ruling constitutes an abuse of discretion when it is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015) (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)).

Rules 61.01(d) and (f) grant the circuit court authority to strike pleadings, in whole or in part, and to enter a judgment of default for a party's failure to appear at a properly noticed deposition. Default is an unforgiving punishment, but it is properly invoked in cases:

> where the record sufficiently shows, (1) the disobedient party engaged in a pattern of repeated disregard of the obligation to comply with the rules of discovery, i.e., the party has demonstrated a contumacious and deliberate disregard for authority of the trial court; and (2) the opposing party was prejudiced thereby.

*Frontenac Bank*, 528 S.W.3d at 390 (footnote omitted).

32

Despite Lewellen's protestations to the contrary, Chad has preserved, as to his personal pleading, this point on appeal. We will, therefore, review his claim concerning the striking of his pleadings under the abuse of discretion standard. Franklin's assertion that the corporate entities' pleadings were struck as impermissible collateral damage, however, was not included in the motion for new trial; therefore, that claim is not preserved for our review. Except as otherwise provided in Rule 78.07, an allegation of error arising from a jury-tried case must be included in the party's motion for a new trial to preserve that claim for appellate review. *Wheeler v. Dean*, 482 S.W.3d 877, 879 (Mo. App. 2016); Rule 78.07. We decline to engage in plain error review of the corporations' discovery violation claim.[15]

During a February 24, 2016 hearing on Lewellen's motion to compel Chad's deposition, Franklin's counsel stated that he was originally in contact with Chad concerning the upcoming deposition but Chad had suddenly become unreachable approximately three weeks earlier. The court entered an order requiring Chad to appear in both his personal and corporate representative capacities at a deposition

---

[15] Franklin contends that the corporate entities were under no obligation to designate a representative to appear because Lewellen failed to serve notices on the corporate entities pursuant to Rule 57.03(b)(4). However, the record demonstrates that the circuit court ordered Chad Franklin to appear at the scheduled deposition in both his personal and corporate representative capacities. To prevail on a claim under the plain error standard of review, a party must demonstrate that the alleged error resulted in manifest injustice or a miscarriage of justice. *Nelson v. Waxman*, 9 S.W.3d 601, 607 (Mo. banc 2000). "Plain error review is discretionary, and will not be granted 'if the claim is not established after an examination of the matter on its face[.]'" *Wheeler*, 482 S.W.3d at 880. (alteration in original) (quoting *Woods v. Friendly Ford, Inc.*, 248 S.W.3d 699, 712 (Mo. App. 2008)). An examination of the face of Franklin's claim does not demonstrate that a manifest injustice or a miscarriage of justice occurred in the striking of the corporate entities' pleadings.

33

date of Lewellen's choosing. Franklin's counsel was warned that a failure to comply with this order would result in sanctions, up to and including the striking of pleadings and the entry of an interlocutory judgment of default. Chad failed to appear at the scheduled deposition, and Lewellen moved for sanctions.

On March 29, 2016, the circuit court heard evidence and argument on Lewellen's motion for sanctions. During that hearing, Franklin's counsel asserted that, upon returning to his office after the previous motion to compel, he received a voicemail from Chad's mother informing him that Chad had checked into Yellowstone Recovery, a rehabilitation center for substance abuse issues in Costa Mesa, California, that did not allow patients to receive communications from the outside world. She further informed counsel that the center would not allow her to reach her son and that she was unsure how long he would be isolated within the center's care. Counsel was unable to confirm that Chad was indeed receiving treatment, informing the court that his attempts to contact the rehabilitation center had resulted in the cryptic message that the center "cannot confirm or deny that he is here, but we'll do something with your message."

At the hearing, Larry Anthony, the parole officer assigned to supervise Chad, testified that, on January 21, 2016, Chad was asked to submit to a random urinalysis test as a condition of his supervised release. Prior to the sample being tested, Chad admitted to Anthony that the sample would return a positive result. On February 4, 2016, Chad informed Anthony that he had secured entry into Yellowstone Recovery starting on February 11, 2016. Anthony testified that Chad

34

had reported in person to Anthony on February 11, 2016, at which point Anthony issued Chad a travel permit authorizing him to leave Missouri to enter rehabilitation. Anthony testified that he had not spoken with Chad since issuing the travel permit and was under the belief that his obligations to report would be halted until he exited the rehabilitation center.

After hearing this testimony and argument from both parties, the circuit court struck the pleadings of Franklin and entered an interlocutory judgment by default for Lewellen against the three parties. On April 19, 2016, Franklin's counsel provided notice to Lewellen that Chad would be produced for deposition by his own counsel on April 27, 2016. Lewellen filed a motion to quash the subpoena that Chad issued to himself, and Franklin filed a corresponding motion asking the circuit court to reconsider its order granting Lewellen's request for sanctions. On April 26, 2016, the circuit court held a hearing, at which Franklin's counsel stated that Chad had contacted him as he was traveling back from the rehabilitation center in California and had expressed his willingness to sit for a deposition. The court granted Lewellen's motion to quash the subpoena and denied Franklin's motion for reconsideration.

Franklin argues that the circuit court did not have the authority to strike his pleadings based on these facts and, instead, improperly considered his previous discovery violations in unrelated cases. While it is true that the circuit court took judicial notice of previous cases, those previous cases can hardly be characterized as "unrelated." The circuit court took judicial notice of Franklin's conduct in

35

previous cases heard in the Seventh Judicial Circuit—namely, the case underlying the instant action and the two cases that had been merged with Lewellen's for discovery purposes. Franklin has not cited any authority that circumscribes the court's ability to consider cases such as these.

In two of those cases, Chad failed to appear for his deposition. In the other case, Chad appeared but invoked his Fifth Amendment right against self-incrimination over 200 times throughout the course of his testimony. We cannot say that the circuit court abused its discretion in determining that this behavior, combined with Chad's failure to appear at the properly noticed deposition in the instant action, was evidence of contumacious and deliberate disregard for the authority of the trial court.

Nothing in the record supports Chad's assertion that he was surprised by this entry of default. He was well aware of the lengthy and ongoing litigation process before he choose to enter rehabilitation without speaking to his attorney. Chad is no stranger to the legal system; therefore, he either knew or should have known that disappearing in the middle of pretrial proceedings without the courtesy of even the slightest notice could result in potentially dire consequences. "If a party neglects to look after the course of the proceeding in which he is involved, he should have no cause to complain about the court's action." *Golden v. Euge*, 612 S.W.2d 362, 363 (Mo. App. 1980).

Nevertheless, our review also requires a finding that the circuit court did not abuse its discretion in determining that Lewellen was prejudiced by Franklin's

contumacious and deliberate disregard of the court's authority. *Frontenac Bank*, 528 S.W.3d at 390. Chad attempts to frame the situation before the circuit court as one with a fixed end date. More precisely, he argues that his failure to appear at the deposition only resulted in a delay of approximately forty-four days, and his reappearance nearly fourteen months prior to the scheduled start of trial provided ample opportunity with which the court could cure any prejudice to Lewellen.

These circumstances were not known to the circuit court at the time it imposed the sanctions, however. At the time Franklin's pleadings were struck and the interlocutory order of default was entered, the date of Chad's return was far from certain. In fact, his counsel, mother, and parole officer were all unable to provide the court with any information concerning even *a possible* return date. Chad's failure to appear at the scheduled deposition impeded Lewellen's ability to gather the information that would ultimately be necessary to prove and defend her claims. *See Karolat*, 151 S.W.3d at 857-58. Therefore, the circuit court did not abuse its discretion in finding that his indefinite, voluntary absence prejudiced Lewellen's ability to engage in discovery. The fact that Chad returned after forty-four days is immaterial, as we review the circuit court's ruling for an abuse of discretion under the circumstances before the court at the time it entered its ruling.[16] *See Cox*, 473 S.W.3d at 114. Franklin's Point I is denied.

---

[16] Franklin's assertion that the circuit court abused its discretion by failing to make a specific finding of prejudice is similarly misplaced. The circuit court is under no obligation to articulate specific findings, either orally or in written form, on the issue of prejudice prior to imposing sanctions. *Binder v. Thorne-Binder*, 186 S.W.3d 864, 867 (Mo. App. 2006).

**B.    Instructional and Evidentiary Errors**

In Points II, III, and IV, Franklin alleges a series of instructional and evidentiary errors concerning the manner in which the jury was allowed to determine punitive damages after the circuit court entered the interlocutory judgment of default based on the discovery violations.  Franklin contends the circuit court committed instructional error by providing the jury with a damage instruction and verdict director that removed the requirement for the jury to make the threshold finding that Franklin's conduct was outrageous due to his evil motive or reckless indifference to Lewellen's rights before awarding punitive damages. Further, Franklin argues that the court erred in excluding evidence that explained why the distribution of settlement funds at issue in the fraudulent transfer claim did not merit an award of punitive damages.  Franklin asserts that these errors violated his due process rights because they stripped the proceedings of adequate safeguards to prevent an arbitrary punitive damages award.

Allegations of instructional error present questions of law, which we review *de novo*.  *Edgerton v. Morrison*, 280 S.W.3d 62, 65 (Mo. banc 2009).  The instruction must be supported by both the evidence presented at trial and the applicable law.  *Marion v. Marcus*, 199 S.W.3d 887, 892 (Mo. App. 2006).  We will reverse for instructional error only if "the instruction misdirected, misled, or confused the jury and resulted in prejudice."  *Edgerton*, 280 S.W.3d at 66.

Further, we review rulings on the admissibility of evidence for an abuse of discretion.  *Howard v. City of Kansas City*, 332 S.W.3d 772, 785-86 (Mo. banc

38

2011).  Evidence must be both legally and logically relevant to be admissible.  *Cox*, 473 S.W.3d at 116.  "Legal relevance requires the trial court to weigh the probative value of the evidence against its costs, such as 'unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence.'"  *Reed v. Kansas City Mo. Sch. Dist.*, 504 S.W.3d 235, 242 (Mo. App. 2016) (internal citation and quotations omitted).  Evidence is logically relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Westerman v. Shogren*, 392 S.W.3d 465, 474 (Mo. App. 2012) (citations and quotations omitted).

Franklin's claims on Points II, III, and IV, share a common concern—that the jury was allowed to award punitive damages without the information necessary to exercise that power in a constitutionally-permissible manner.[17]  Therefore, we will address these points together.

It has been recognized that "compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes."  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  Compensatory damages seek to redress the concrete harm experienced by

---

[17] Lewellen's contention that Franklin's due process claim is deficient because it does not apply the three-factor analysis set forth by the Supreme Court in *State Farm* is mistaken.  *See State Farm*, 538 U.S. at 418.  The *State Farm* factors are used when a litigant challenges a punitive damage verdict by alleging it is grossly excessive.  *Heckadon v. CFS Enters., Inc.*, 400 S.W.3d 372, 382 (Mo. App. 2013).  Franklin's current challenge is not one of degree but of imposition; therefore, the *State Farm* factors do not apply.  The Due Process Clause prohibits excessive *and* arbitrary awards.  *State Farm*, 538 U.S. at 416.

the plaintiff, while punitive damages aim to deter and exert a measure of retribution for the defendant's actions. *Id.* In Missouri, the trial court's discretion to award punitive damages is tethered to "procedural and substantive constitutional limitations[.]" *Id.* The source of these limitations is the Due Process Clause of the Fourteenth Amendment, "which prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.*

In determining whether the imposition of punitive damages comports with due process, we are not guided by a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991). It is certain, however, "that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." *Id.* In Missouri, the jury is given more precise instruction concerning what manner of conduct exposes a defendant to a judgment awarding punitive damages. *See* MAI 10.01 [2008 Revision]. Punitive damages are proper when the plaintiff demonstrates, by clear and convincing evidence, that the defendant's conduct was "outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 908(2) (AM. LAW. INST. 1979)); *see also Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996) (adopting the clear and convincing standard for punitive damages); MAI 10.01 [2008 Revision].

Lewellen argues that, due to the entry of the interlocutory default judgment in her favor, the jury was properly informed that the sole determination for them to make was the value of the punitive damages award. She notes that the circuit court stated during the jury trial that it had case law authorizing the court to make a ruling on liability for punitive damages. That case law is not specified in the transcript, and Lewellen does not illuminate the path to this case in her brief. From a review of the pretrial proceedings, however, it appears the case in question is *Anderson v. Arrow Trucking Co.*, 181 S.W.3d 185 (Mo. App. 2005).

In *Anderson*, the circuit court entered judgment against the defendant after striking that party's pleadings for repeated violations of a discovery order. *Id.* at 187. The party's damages in *Anderson* were determined through a hearing before the circuit court, not by an empaneled jury. *Id.* There is no doubt that the circuit court can enter a judgment by default against a disobedient party. *See, e.g.*, *Marmaduke v. CBL & Assoc. Mgmt., Inc.*, 521 S.W.3d 257, 271 (Mo. App. 2017); *see also* Rule 61.01. Franklin's contention, however, is a beast of a different nature.[18] Franklin's complaint is focused on what occurred *after* the imposition of sanctions.

---

[18] The similar assertion made by Lewellen that other cases have upheld punitive damages after a default does not dispose of the issue. In both cases cited by Lewellen, all damages were awarded without the aid of a jury. *See Norber*, 134 S.W.3d at 661; *see also Scott v. LeClercq*, 136 S.W.3d 183, 193 (Mo. App. 2004).

41

After striking Franklin's pleadings and entering the interlocutory default judgment, the circuit court clarified the effect of the default by stating in pertinent part:

> [Lewellen] may introduce the evidence and allegations as referenced in [Lewellen's] amended petition without contest by [Franklin][.] However, should [Lewellen] offer "new" evidence or allegations which were not referenced in [Lewellen's] current amended petition, [Franklin] shall be permitted to respond with evidence, cross examination, or testimony in response to such "new" evidence (e[.]g[.] insurance bad faith settlement expert testimony)[.]
>
>   * * *
>
> Damages Evidence[.]  Notwithstanding the discovery sanctions Judgment against [Franklin] as to liability for [Lewellen's] claims, [Franklin] is permitted to defend as to existence or amount of [Lewellen's] damages, i[.]e[.] respond to [Lewellen's] damages evidence[.]  [Franklin] may cross examine witnesses and offer evidence in this regard[.]  [Franklin] may respond to [Lewellen's] opening statement in its opening statement as to damages. [Franklin's] evidence of a bank lien or attorney's lien upon the settlement proceeds from [Chad and Tiffany] Franklins' third party bad faith settlement may be offered for the <u>sole purpose</u> of determining the amount of [Lewellen's] actual damages[.]  [Franklin] may not offer such lien evidence for the purposes [of] disproving liability, nor may [Franklin] offer any other evidence, or argument regarding matters of liability at any time[.]

This order plainly allowed Franklin to present evidence probative of the existence or amount of damages.[19]  However, during Franklin's motion for a directed verdict at the close of Lewellen's evidence, the circuit court expressed concern that Franklin's counsel was attempting to indirectly present the jury with a second

---

[19] The circuit court reiterated this distinction in its subsequent entry of the interlocutory order of default, in which it stated: "The case will proceed for determination of [Lewellen's damages].

42

chance to decide previously determined liability issues.[20]  This concern created a domino effect, starting with the exclusion of attorney David Mayer's testimony, which stripped this proceeding of due process protections and of Franklin's right for a jury to decide punitive damages.

In Point IV, Franklin alleges that the circuit court erred in excluding testimony from Mayer about the structure of disbursements of settlement funds between Tiffany Franklin, Fifth Third Bank, and the law firm of Monsees, Miller, Presley, and Amick P.C.  At trial, Franklin attempted to have Mayer testify about the $900,000 confidential settlement brokered by his law firm between Universal and the Franklins for a claim of bad faith.  Mayer was allowed to testify about the amount of the settlement and the existence of distributions to Fifth Third Bank and Mayer's law firm, but he was not allowed to explain why the settlement or the distributions occurred.

---

[20] The circuit court specifically stated:

> We've heard this motion before, and I think obviously there's a unique scenario here in that the nature of what we have in terms of findings of liability or the default judgment go right at the issue at the behavior of the Defendant who had failed to come forward for a deposition, and failed to come forward, even after an order was entered.
>
> And the facts were deemed admitted and liability was established.  And at some level, it is extremely difficult, from the Court's perspective, to have a Defendant who has, by his pattern and practice been uncooperative, even to the point of violating court order, and benefiting, in effect, from not ever coming forward and testifying and delaying the case.  And then to be able to come back here later and to try to offer evidence under the guise of lack of evil motive and malicious behavior, and in effect, really challenge and undermine the underlying finding of liability, which was the sanction, which it only comes after his admission of the truth of fact.
>
> So in this scenario, I'm going to be consistent with my prior rulings, having a case on point that directly says differently on this specific issue on the Court's ability to make the finding of fact of liability for punitives.

43

During the subsequent offer of proof, Mayer testified that Tiffany Franklin was added to the lawsuit on the advice of counsel after Mayer determined that, as a named insured, she had "substantial" legal rights which were being harmed by Universal's alleged bad faith. Further, Mayer testified that, at the time of settlement, Chad and Tiffany Franklin were married but were engaged in the process of litigating a divorce. Mayer continued, testifying that the confidential nature of the settlement was not unusual and the nature of the $250,000 distribution to Fifth Third Bank was that of a partial satisfaction of a judgment lien against Chad.[21] Franklin alleges that this information was essential to the jury's determination of punitive damages.

Franklin's presentation of this evidence would have allowed him to argue that his actions were either not reprehensible or were only slightly reprehensible and, therefore, did not support a large punitive damages award. This opportunity is important because "[t]he reprehensibility of the defendant's conduct is a key factor in determining the amount of punitive damages to which a plaintiff is entitled." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 380 (Mo. banc 2012) (citing *State Farm*, 538 U.S. at 419). Further, for Lewellen to present a submissible case for punitive damages under normal circumstances, she would need to demonstrate "clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard

---

[21] Mayer testified that Fifth Third Bank had a "multi-million dollar lien" against Chad Franklin and this comparatively small distribution was the full amount of settlement funds allocated to Chad Franklin.

for an act's consequences such that an evil motive may be inferred." *Drury v. Mo. Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 573 (Mo. App. 2008).

This case presents a novel issue in which the circuit court entered an interlocutory judgment of default that had the effect of finding Lewellen had adequately demonstrated clear and convincing proof of a culpable mental state that justified the jury's consideration of a punitive damage award. As the trial progressed, however, the effect of the default expanded to swallow the ability of the jury to determine the comparative level of reprehensibility in Franklin's actions. To borrow language from MAI 10.01, the circuit court's ruling informed the jury that Franklin's conduct was outrageous, but then prevented Franklin from presenting relevant information about the degree of outrageousness.

Lewellen's repeated attempts to characterize testimony explaining why the settlement occurred the way it did as an attack on liability is misplaced. Evidence concerning liability would potentially be subject to a number of meritorious objections, but "evidence which is inadmissible for one purpose may be admissible for another." *Danbury v. Jackson Cty.*, 990 S.W.2d 160, 165 (Mo. App. 1999). Here, the testimony was probative of both liability and punitive damages; however, after the default, it was properly admissible for the sole purpose of arguing punitive damages. The testimony should have been admitted subject to a limiting instruction, if requested by Lewellen.[22] *See Benoit v. Mo. Highway & Transp.*

---

[22] We cannot, however, support Franklin's loosely attached proposition that he had an absolute constitutional right to the admission of any evidence mitigating the potential punitive damages

45

*Comm'n*, 33 S.W.3d 663, 671 (Mo. App. 2000). The circuit court abused its discretion by excluding this evidence.[23] Franklin's Point IV is granted.

In Point II, Franklin alleges this overarching constitutional error resulted in the circuit court giving a jury instruction that did not properly instruct the jury on its obligations concerning any punitive damages award to Lewellen. On both counts, the jury was instructed:

> In addition to any actual damages to which you found Plaintiff Lillian Lewellen entitled under Instruction Number 7,[24] you may award Plaintiff Lillian Lewellen an additional amount as punitive damages in such sum as you believe will serve to punish Defendants Chad Franklin, Chad Franklin National Auto Sales North, LLC, and CFS Enterprises, Inc[.] and to deter Defendants Chad Franklin, Chad Franklin National Auto Sales North, LLC, and CFS Enterprises, Inc[.] and others from like conduct[.]
>
> You may consider harm to others in determining whether Defendants Chad Franklin's, Chad Franklin National Auto Sales North, LLC's, and CFS Enterprises, Inc[.]'s conduct was outrageous[.] However, in determining the amount of any punitive damages award, you must not include damages for harm to others who are not parties to this case.

This instruction was an amalgamation of modified versions of MAI 31.07(A) and MAI 10.01. This degree of modification was unnecessary and improper.

---

award. The mere fact that punitive damages are at issue does not cause the complete destruction of every rule of evidence.

[23] This is not to say that any limitation of a party's ability to participate in a jury trial deciding damages is unconstitutional. In fact, the circuit court is vested with wide discretion in its fashioning of sanctions for discovery violations. *See Frontenac Bank*, 528 S.W.3d at 390.

[24] This instruction concerned the fraudulent transfer claim. Instruction No. 14, the punitive damages instruction for the MMPA violations claim, is exactly the same but directs the jury to reference Instruction No. 12, which is the liability instruction for that claim.

46

Where an applicable MAI exists, its use is mandatory. *Abbott v. Mo. Gas Energy*, 375 S.W.3d 104, 108 (Mo. App. 2012). If the MAI must be modified to accurately and fairly submit the issue to the jury, "such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(b). MAI 10.01 states:

> If you find the issues in favor of plaintiff, and if you believe the conduct of defendant as submitted in Instruction Number (here insert number of plaintiff's verdict directing instruction) was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number (here insert number of plaintiff's damages instruction), you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.
>
> [You may consider harm to others in determining whether defendant's conduct was outrageous. However, in determining the amount of any punitive damage award, you must not include damages for harm to others who are not parties to this case.][25]

This instruction is not completely applicable to the claims at issue in this case because it contains a cross-reference to a verdict director, which is improper after the default. The modification, however, also deletes the section informing the jury that they must find Franklin's conduct was "outrageous because of defendant's evil motive or reckless indifference to the rights of others." "The test of a modified MAI . . . is whether it follows the substantive law and can be readily understood by the jury." *Lashmet v. McQueary*, 954 S.W.2d 546, 550 (Mo. App. 1997). As

---

[25] Brackets indicate optional portions of the instruction that can be used if supported by the evidence presented during trial.

discussed at length, *supra*, the default did not remove this required finding from the jury's determination; therefore, this modified instruction misstates the substantive law and the jury's concomitant obligations.

To reverse, however, we must also find that this instructional error prejudiced Franklin. Prejudice sufficient for reversal due to instructional error occurs where an error "materially affected the merits and outcome of the case[.]" *Blunkall v. Heavy & Specialized Haulers, Inc.*, 398 S.W.3d 534, 544-45 (Mo. App. 2013). The modification of 10.01 removing the requirement that the jury find that Franklin's conduct was outrageous materially affected the merits and the outcome of the case. Lewellen urges that no prejudice exists because the jury was properly instructed after the default. That is incorrect. For the sake of clarity, we are not stating that the circuit court is prohibited from fashioning a sanction that finds the existence of, or liability for, punitive damages. However, because the circuit court allowed the determination of damages to proceed to an empaneled jury, it was required to abide by the Due Process principles contemplated by the Supreme Court and MAI 10.01. Those principles require the court to allow the parties to present evidence that enables the jury to make properly informed decisions about the comparative reprehensibility of the defendant's actions. To do otherwise invites arbitrary or capricious awards of punitive damages by the members of the jury. Therefore, Franklin's Point II is granted. We reverse the jury's award of punitive damages and remand for a new determination of damages consistent with this opinion.

In Point III, Franklin alleges that circuit court erred by presenting verdict forms to the jury that did not require them to make specific line-item findings as to Franklin's liability for punitive damages. Franklin cites no support for this specific proposition. It is true that a jury must find that a defendant's conduct was "outrageous because of defendant's evil motive or reckless indifference to the rights of others," but there is no obligation for the jury to enter a line-item on the verdict form stating this. MAI 10.01; *see also* MAI 36.11; MAI 36.12. Further, Franklin's proffered verdict forms inappropriately attempt to confuse the issues concerning his liability, which had already been determined, and punitive damages by using the phrase "liable for punitive damages" in the verdict form. *See* Rule 70.02. Franklin's Point III is denied.

## C.    Denial of Motion for a Directed Verdict

In Point V, Franklin alleges the circuit court erred in failing to grant his motion for a directed verdict because Lewellen failed to present evidence that Franklin's unlawful act occurred in connection with the sale or advertisement of merchandise.

We will overturn a denial of a motion for directed verdict only where the plaintiff failed to make a submissible case. *Atkinson v. Corson*, 289 S.W.3d 269, 281 (Mo. App. 2009). A submissible case is one in which the plaintiff presents substantial evidence for every fact necessary to sustain liability. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 520 (Mo. App. 2007). "Substantial evidence is that which, if true, has probative force upon the issues, and from

49

which the trier of fact can reasonably decide the case." *Id.* at 520-21 (internal citation and quotations omitted).

Franklin asserts that Lewellen did not make a submissible case on the MMPA claim. This challenge mischaracterizes what burdens Lewellen still faced at trial. Prior to trial, the circuit court properly struck Franklin's pleadings and entered an interlocutory judgment of default for Lewellen on her MMPA claim. *See* Rule 61.01. This took the issue from the jury and allowed the circuit court to enter a judgment admitting the traversable elements of the MMPA claim. *See Beckmann*, 45 S.W.3d at 541. This point is another attempt by Franklin to collaterally attack the entry of default for discovery violations. At the time the MMPA claim was presented to the jury to determine damages, it had already been decided, by virtue of the default, that Lewellen had made a submissible claim on every element other than damages. As Franklin does not challenge Lewellen's presentation of damages evidence, this point is without merit. Franklin's Point V is denied.

### D.    Failure to Merge Punitive Damages Awards

In Point VI, Franklin contends the circuit court erred in failing to merge the punitive damages awards for the fraudulent transfer claim and MMPA claim. As we are reversing the punitive damages award, we need not reach this claim.

## IV.    Motion for Attorneys' Fees on Appeal

50

Prior to submission of her case, Lewellen made a motion requesting attorneys' fees[26] on appeal pursuant to Missouri Court of Appeals, Western District Special Rule 29.[27] In awarding attorneys' fees, we follow the "American Rule," which provides that "orders requiring one party to pay another party's attorney's fees or other expenses ordinarily are not permitted unless the parties' contract or a statute authorizes the court to make such an award." *Birdsong v. Children's Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454 (Mo. App. 2015) (internal citation and quotations omitted). Lewellen asserts that her claims are eligible for an award of attorneys' fees pursuant to Section 407.025, which allows the prevailing party to recover attorney's fees if the opposing party employed an unlawful method in the sale of "merchandise primarily for personal, family or household purposes." One of these unlawful methods is the use of fraud or misrepresentation "in connection with the sale or advertisement of any merchandise in trade or commerce[.]" § 407.020. We agree that this statute allows this court to award attorneys' fees; nevertheless, we are still vested with the discretion to decline the award of such fees. § 407.025. Based on the mixed result of this appeal, we decline to award Lewellen attorneys' fees incurred as a result of this proceeding.

---

[26] We understand the plural use of the possessive to mean that Lewellen is seeking fees for both Mr. and Ms. Noland.

[27] Western District Court of Appeals Special Rule 29 provides, in pertinent part: "Any party claiming an amount due for attorney's fees on appeal pursuant to contract, statute or otherwise and which this Court has jurisdiction to consider, must file a separate written motion before submission of the cause."

## CONCLUSION

The judgment is reversed with regard to the equitable garnishment claim against Universal on the MMPA claim and the punitive damages award against Franklin.  The cause is remanded for proceedings consistent with this opinion relative to punitive damages.  In all other respects, the judgment is affirmed.

LISA WHITE HARDWICK, JUDGE

ALL CONCUR.