

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| ESTATE OF MAX E. OVERBEY, DECEASED, BY GLENNA J. OVERBEY, PERSONAL REPRESENTATIVE, and GLENNA J. OVERBEY, | ) ) ) ) ) |
| | )   **WD84401** |
| Respondents, | ) |
| v. | )   **OPINION FILED:** |
| | )   **April 5, 2022** |
| | ) |
| UNIVERSAL UNDERWRITERS INSURANCE COMPANY, et al., | ) ) |
| | ) |
| Appellants. | ) |

**Appeal from the Circuit Court of Clay County, Missouri
The Honorable Timothy J. Flook, Judge**

**Before Division One:** Mark D. Pfeiffer, Presiding Judge, and
Karen King Mitchell and Gary D. Witt, Judges

Universal Underwriters Insurance Company and Zurich American Insurance Company[1]

(collectively, Universal) appeal the equitable garnishment judgment finding policy coverage for

damages awarded to Max and Glenna Overbey[2] on their underlying Missouri Merchandising

Practices Act (MMPA) claim against Chad Franklin and his dealership Chad Franklin National

---

[1] Universal is a subsidiary of Zurich.

[2] Max Overbey died on September 8, 2010; his estate, Glenna Overbey, Personal Representative, was substituted as a party in the underlying action.

Auto Sales North, LLC (NAS) (collectively, Franklin). Universal raises three claims on appeal, arguing that the trial court erred in granting equitable garnishment to the Overbeys because (1) Franklin's conduct underlying the MMPA judgment was not a covered "occurrence" under Universal's policies; (2) Franklin's actions constituted dishonest and/or intentional conduct, which are both excluded from coverage under the policies; and (3) coverage for punitive damages is excluded under the policies and violates Missouri public policy. Because the Overbeys failed to prove that the policies covered Franklin's conduct, we reverse the trial court's equitable garnishment judgment against Universal.[3]

**Background**

On September 15, 2007, the Overbeys purchased a Suzuki automobile for their grandson and his wife from NAS as part of a "Drive for Life" program. The program advertised car payments as low as $43 per month. The Overbeys understood the program to allow them to purchase a Suzuki, drive it for six months, return the vehicle to NAS, and select a new vehicle at the same low monthly rate.

To participate in the program, the Overbeys had to sign a sales contract and documents obligating them to a high-interest loan to purchase the car, with Franklin agreeing to send them sufficient funds to reduce their effective payment to only $49 per month. The car was valued at $19,995, but the sales contract listed the purchase price as $33,995, and the loan amount was listed as $37,000. Unbeknownst to the Overbeys at the time, the loan amount included a $499.95 document fee, a $599 gap insurance fee, and a $1,400 extended warranty fee for a car they were, under the terms of the program, to own for only six months. Additionally, the Overbeys paid a

---

[3] To avoid confusion, we refer to the court that issued the judgment being appealed here as "the trial court"; we refer to the court that heard the underlying MMPA case as "the MMPA court."

$500 membership fee to participate in the program but were promised a $400 gas card as part of the deal.

The funds Franklin provided were insufficient to keep the Overbeys' monthly payment at $49 for the entire six-month period. And, when the Overbeys attempted to trade in their vehicle after six months, Chad Franklin and NAS disavowed knowledge of the "Drive for Life" program, thereby obligating the Overbeys to pay the full loan amount of $719 per month.[4]

The Overbeys sued Chad Franklin and NAS, among others, claiming negligent misrepresentation, intentional misrepresentation, and MMPA violations. As to their MMPA claims against Chad Franklin and NAS, the Overbeys alleged,

> the actions of [Chad Franklin/NAS] were intentional, deliberate, willful, wanton, malicious and without just cause or excuse and were outrageous because of [Chad Franklin/NAS]'s evil motive or reckless indifference to the rights of others, thereby entitling [the Overbeys] to punitive damages and to deter [Chad Franklin/NAS] and others from like conduct.

A jury trial was held in August 2010. The Overbeys, their grandson, and his wife testified to the following.[5] The Overbeys, who had limited financial means, wanted a car for their grandson's wife to commute to school. They learned about the "Drive for Life" program from a family friend and from commercials featuring Chad Franklin. Attracted by the promise of low monthly payments, Max Overbey, his grandson, and his grandson's wife visited NAS. During nearly six hours at the dealership, the Overbeys repeatedly explained that they could not afford to pay more than $20,000. The salesmen continually assured the Overbeys that their monthly payment would not exceed $49. When the Overbeys expressed concern about the $37,000 figure on the loan documents, the salesmen assured the Overbeys that those documents were just a

---

[4] Subsequently, Glenna Overbey was able to refinance the vehicle and reduce their monthly payment to $679.
[5] Chad Franklin and NAS did not appear or otherwise participate in the MMPA trial, but they were represented by counsel throughout trial.

formality to get into the program.[6]  During one of these conversations, a salesman told Max Overbey's granddaughter-in-law that the car was actually worth $19,995.

For the first several months, the Overbeys paid $49 per month, but the funds provided by NAS were insufficient to cover the entire six-month period, so the Overbeys' monthly payment soon exceeded $49.[7]  The Overbeys never received the promised $400 gas card.  At the conclusion of the six-month period, Chad Franklin and NAS denied knowledge of the $49/month deal and informed the Overbeys that they were responsible for the full monthly payment of $719.

The Overbeys introduced evidence of 73 other complaints against NAS filed with the Consumer Protection Division of the Missouri Attorney General's Office.  Of those 73 complaints, 35 involved complaints about the financing arrangements and raised concerns similar to those expressed by the Overbeys.  The Overbeys also called four witnesses who testified about similar complaints against NAS.  The witnesses testified that NAS "misrepresented a lot of things," provided false information, and "lied."

Although not evidence admitted at the trial, statements made by the Overbeys' counsel during closing argument are noteworthy.  Counsel argued,

> When [Chad Franklin and NAS] used that promotion and they used those ads and they used that scheme to get people in, they did so and they lied.  No way around it. They lied.  They told these people something was going to happen.  Six months later, it didn't.  That, ladies and gentlemen, is a violation of the [MMPA].

Counsel also argued that punitive damages are "to punish [Chad Franklin and NAS] not only for the lies that they told these people, but the lies they told the 35 other people in that period of time

---

[6] Glenna Overbey testified that, when she went to NAS a few days later, the salesman responded to her concerns about the loan amount by saying, "These figures mean nothing.  They are for our records only.  These have nothing to do with you.  These numbers, this contract is for our records only.  No one else is involved in this."

[7] Max Overbey testified that NAS sent Glenna Overbey a check for $3,253 to cover the difference between the promised $49/month payment and the amount due monthly under the loan ($719).  At the rate of $719/ month, $3,253 woud cover fewer than five months of payments.

when they were promoting these cars and cooking this scheme up and doing it on a wide range scale."

Only the MMPA claims against Chad Franklin and NAS were submitted to the jury; the remaining counts were dismissed with prejudice. The jury returned verdicts for the Overbeys on their MMPA claims against both Chad Franklin and NAS and awarded the Overbeys $4,500 in actual damages and $1 million in punitive damages against Chad Franklin, as well as $76,000 in actual damages and $250,000 in punitive damages against NAS. The MMPA court initially entered judgment for the entire amount but later amended its judgment to both reduce the $1 million punitive damages award against Chad Franklin to $500,000, pursuant to § 510.265,[8] and award the Overbeys attorneys' fees in the amount of $72,000.

Franklin appealed, arguing that the Overbeys failed to make a submissible case against him and that the reduced amount of punitive damages awarded was still excessive. The Overbeys appealed from the reduction of the punitive damages award.[9] Our Supreme Court affirmed the judgment below. *Est. of Overbey v. Chad Franklin Nat'l Auto Sales N.*, 361 S.W.3d 364 (Mo. banc 2012). In doing so, the Supreme Court concluded that the judgment

> is fully supported by the evidence that [Chad Franklin and NAS], which was wholly owned by him when the Overbeys purchased their SUV, committed fraud in falsely representing to the Overbeys (and making similar representations to others) that they would owe only $49 per month if they joined a membership program for $500, but in fact the contract they signed obligated them to pay more than $37,000 over six years.

*Id.* at 369.

---

[8] Section 510.265 states, in pertinent part, "No award of punitive damages against any defendant shall exceed the greater of: (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." § 510.265.1. All statutory references are to the Revised Statutes of Missouri (Cum. Supp. 2010).

[9] Because the parties challenged the constitutionality of the punitive damages statute, the Supreme Court of Missouri had exclusive jurisdiction over their appeals. Mo. Const. art. V, § 3.

After being unable to collect their MMPA judgments, the Overbeys filed an eight-count petition against Universal and others.[10] Universal had insured Chad Franklin, NAS, and related individuals and entities under two consecutive insurance policies—the first from December 1, 2006 to December 1, 2007 (2007 policy) and the second from December 1, 2007 to December 1, 2008 (2008 policy)—both bearing the policy number 260929. Count I (equitable garnishment against Universal) and Count II (declaratory judgment against Universal) of the Overbeys' petition were severed from the remaining counts, and a bench trial was held on those counts.[11]

For purposes of discovery and trial on Counts I and II, the Overbeys' case was consolidated with two other "Drive for Life" cases involving very similar underlying transactions, insurance policies, and coverage issues—*Lewellen v. Universal Underwriters Insurance Company* and *Heckadon v. Universal Underwriters Insurance Company*. During the bench trial, Glenna Overbey testified that she "investigated [the 'Drive for Life' program] thoroughly before [they] got involved, and it was told to [them] it was perfectly legal." She also testified that she had no idea that Chad Franklin or NAS was trying to injure her or cause her harm.

On March 29, 2017, the trial court issued its "fourth amended findings of fact and conclusions of law and partial judgment," which is the judgment being appealed here. The trial court found the terms "damages," "occurrence," and "injury" in the policies to be ambiguous and concluded that the Overbeys met their burden to establish coverage for the MMPA judgments against Chad Franklin and NAS. The trial court also concluded that Universal failed to prove that (1) a policy exclusion applied to the MMPA claims; (2) punitive damages were not recoverable

---

[10] The Overbeys' petition also named the following defendants: Chad Franklin; NAS; CFS Enterprises, Inc. d/b/a Legend Suzuki and/or Chad Franklin Suzuki; and Tiffany Franklin (Chad Franklin's wife).

[11] The remaining counts were for fraudulent conveyance (all defendants), MMPA violations (all defendants), civil conspiracy (all defendants), joint venture or joint enterprise (all defendants), bill in equity (all defendants), and tortious interference with a business expectancy (Universal).

6

under the policies; and (3) coverage for punitive damages violates Missouri public policy. Having found that the Overbeys were entitled to equitable garnishment against Universal, the trial court determined that Count II (declaratory judgment) was inappropriate and, therefore, denied Count II. The trial court awarded the Overbeys $902,500 with interest from November 18, 2010, plus costs. It is not clear from the face of the judgment whether the trial court found coverage under the 2007 policy, the 2008 policy, or both, but there are only slight differences in the key provisions of the policies and those differences are inconsequential for purposes of this appeal. Notably, the trial court made no findings regarding whether Franklin's conduct was intentional, and the court did not endeavor to discern whether it mattered. In a separate ruling, the trial court granted summary judgment for Universal on Counts III-VIII.

On January 8, 2021, the Overbeys voluntarily dismissed their claims against the remaining defendants, and the trial court issued a judgment on April 14, 2021, designating the fourth amended findings of fact and conclusions of law as to the Overbeys' equitable garnishment claim as final for purposes of appeal because "all parties and all claims are disposed of." Universal appeals.[12]

## Jurisdiction

We have "an obligation, acting *sua sponte* if necessary, to determine [our] authority to hear the appeals that come before [us]." *McConnell v. West Bend Mut. Ins. Co.*, 606 S.W.3d 181, 187 (Mo. App. W.D. 2020) (quoting *Maly Com. Realty, Inc. v. Maher*, 582 S.W.3d 905, 910 (Mo. App. W.D. 2019)). "If we lack appellate jurisdiction, the appeal must be dismissed." *Id.* "The right to appeal is purely statutory and, where a statute does not give a right to appeal, no right exists." *Id.* (quoting *Wilson v. City of St. Louis*, 600 S.W.3d 763, 767 (Mo. banc 2020)). "Although many

---

[12] Following the Overbeys' voluntary dismissal on January 8, 2021, Universal timely filed a post-judgment motion, which the court's April 2021 judgment implicitly denied. Thus, Universal's notice of appeal first filed on February 17, 2021, and subsequently amended, was timely.

statutes govern the right to appeal, the only statute even potentially applicable to the present case is section 512.020(5) which provides that 'final judgments' are appealable." *Id.* (quoting *Wilson*, 600 S.W.3d at 767).

For purposes of § 512.020(5), a final judgment must satisfy two criteria: (1) "it must be a judgment (i.e., it must fully resolve at least one claim in a lawsuit and establish all the rights and liabilities of the parties with respect to that claim)"; and (2) "it must be 'final,' either because it disposes of all claims (or the last claim) in a lawsuit, or because it has been certified for immediate appeal pursuant to Rule 74.01(b)."[13] *Wilson*, 600 S.W.3d at 771. A judgment may be certified under Rule 74.01(b) "only if it disposes of a 'judicial unit' of claims, meaning it: (a) disposes of all claims by or against at least one party, or (b) it disposes of one or more claims that are sufficiently distinct from the claims that remain pending in the circuit court." *Id.* "Determining whether these criteria are met is a question of law and depends on 'the content, substance, and effect of the order,' not the circuit court's designation." *Id.* (quoting *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997)).

Here, Universal appeals the trial court's judgment granting equitable garnishment to the Overbeys. The trial court denied the Overbeys' claim for declaratory judgment and granted summary judgment in favor of Universal on all of the Overbeys' remaining claims against Universal. The Overbeys then voluntarily dismissed the remaining defendants, without prejudice. Following the voluntary dismissal, the trial court issued its April 14, 2021 judgment designating its March 29, 2017 "fourth amended findings of fact and conclusions of law and partial judgment," as final for purposes of appeal because "all parties and all claims are disposed of."

---

[13] All rule references are to the Missouri Supreme Court Rules (2020).

The equitable garnishment judgment fully resolved at least one claim in a lawsuit—the equitable garnishment claim against Universal—and the judgment established all the rights and liabilities of the parties with respect to that claim. The Overbeys then voluntarily dismissed all remaining claims against all remaining parties. The equitable garnishment judgment coupled with the voluntary dismissal makes the equitable garnishment judgment final for purposes of appeal because no other claims are pending and there is nothing left for the trial court to determine. *See Stewart v. Liberty Mut. Ins. Co.*, 349 S.W.3d 381, 384 (Mo. App. W.D. 2011) (a previously entered partial summary judgment on one count became a final judgment when the plaintiff voluntarily dismissed his remaining counts against Liberty Mutual); *Huskey v. Queen City Roofing & Contracting Co.*, 523 S.W.3d 610, 613 (Mo. App. S.D. 2017) (the plaintiff was permitted to voluntarily dismiss the remaining counts and the partial summary judgment "then became a final judgment because no other claims or parties remain[ed] pending." (quoting *Stewart*, 349 S.W.3d at 384-85)). Having satisfied ourselves that we have appellate jurisdiction, we turn to Universal's claims on appeal.

## Standard of Review

"In determining whether Universal's policy affords coverage for the damages awarded [to the Overbeys], we interpret the insurance policy *de novo*." *Lewellen v. Universal Underwriters Ins. Co.*, 574 S.W.3d 251, 259 (Mo. App. W.D. 2019). We review factual determinations made by the trial court under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Id.* "Thus, we will affirm the circuit court's judgment 'unless there is no substantial evidence to support it or unless it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law.'" *Id.* (quoting *Schmitz v. Great Am. Assurance Co.*, 337 S.W.3d 700, 705 (Mo. banc 2011)).

9

**Analysis**

Universal raises three claims on appeal. Universal argues that the trial court erred in granting equitable garnishment to the Overbeys because (1) Franklin's conduct underlying the MMPA judgment does not constitute a covered "occurrence" under Universal's policies; (2) Franklin's actions constituted dishonest and/or intentional conduct, which are both excluded from coverage under the policies; and (3) coverage for punitive damage is excluded under the policies and violates Missouri public policy.

"To establish an equitable garnishment claim, judgment creditors must prove: (1) 'that they obtained a judgment in their favor against [the] insured'; (2) 'that [insurer's] policies were in effect when the incident occurred'; and (3) 'that [insurer's] policies covered the damages awarded in the [u]nderlying [j]udgment against [insured].'" *McConnell*, 606 S.W.3d at 189 (quoting *Kretsinger Real Est. Co. v. Amerisure Ins. Co.*, 498 S.W.3d 506, 510-11 (Mo. App. W.D. 2016)). Accordingly, the Overbeys bore the burden to prove that (1) they had judgments in their favor against Chad Franklin and NAS; (2) Universal's policies were in effect when the Overbeys suffered their injuries; and (3) the policies covered the damages awarded against Chad Franklin and NAS. Here, there is no question that the Overbeys obtained judgments against Chad Franklin and NAS, who were both insureds under the policies that were in effect when the injuries occurred. The only question is whether the policies provide coverage for Franklin's conduct underlying the MMPA judgment.

"In reviewing the language contained in insurance policies, we apply the meaning of the terms that 'would be attached by an ordinary person of average understanding if purchasing insurance,'" *Lewellen*, 574 S.W.3d at 259 (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)), "and we will interpret the contract 'as to afford coverage rather than defeat'

10

it." *Id.* (quoting *Universal Underwriters Ins. Co. v. Dean Johnson Ford, Inc.*, 905 S.W.2d 529, 533 (Mo. App. W.D. 1995)). "Where no ambiguity exists, we will enforce the contract according to its terms." *Id.* "However, if we find an ambiguity within the policy, we will resolve that ambiguity against the insurer." *Id.* "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Id.* (quoting *Swadley v. Shelter Mut. Ins. Co.*, 513 S.W.3d 355, 357 (Mo. banc 2017)). "The plaintiff must establish coverage under the policy, but the insurer must establish that an exclusion to coverage applies." *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. banc 2015). Exclusions "are construed strictly against the insurer." *Id.*

The relevant portions of the 2007 and 2008 policies are Coverage Part 500, which governs Garage Operations, as defined in that part, and Coverage Parts 970 and 980, which are umbrella policies. Coverage Part 500 of the 2007 policy states, in pertinent part: "WE will pay all sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies . . . caused by an OCCURRENCE arising out of YOUR GARAGE OPERATIONS . . . ."[14] In relevant parts, both policies define "occurrence" as "an accident . . . which results in such INJURY . . . neither intended nor expected from the standpoint of a reasonably prudent person."[15]

---

[14] The 2008 policy uses slightly different language, but the differences are inconsequential here. We have provided the coverage language for Coverage Part 500. While Coverage Parts 970 and 980 also use slightly different language, the differences are not functionally significant. In pertinent part, Coverage Parts 970 and 980 of the 2007 policy state: "WE will pay for LOSS, subject to the terms and conditions of the Coverage Part, in excess of: (1) coverage provided in any UNDERLYING INSURANCE; (b) coverage provided to an INSURED in any other insurance; (c) in the absence of (a) or (b) the retention shown in the declarations." "LOSS" means "all sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies, caused by an OCCURRENCE." In relevant part, Coverage Parts 970 and 980 of the 2008 policy state: "WE will pay those sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies, caused by an OCCURRENCE . . . ."

[15] The policies also exclude coverage for, among other things, (1) "an OCCURRENCE, SUIT or claim arising out of any dishonest, fraudulent or criminal acts committed by any INSURED"; and (2) "any act committed by or at the direction of the INSURED with intent to cause harm."

In both *Heckadon* and *Lewellen*, the two cases consolidated with the instant case for purposes of trial on the issue of insurance coverage, this court found nothing facially vague or ambiguous in the policy language. *Lewellen*, 574 S.W.3d at 263-64; *Heckadon v. Underwriters Inc. Co.*, 586 S.W.3d 789, 800 (Mo. App. W.D. 2019). We concluded that Franklin's conduct underlying the MMPA judgments in those cases did not constitute an "occurrence" under the policies, and we reversed the circuit court's equitable garnishment judgments. *Lewellen*, 574 S.W.3d at 264; *Heckadon*, 586 S.W.3d at 805-06.

As in *Lewellen* and *Heckadon*, here the trial court erred in finding that the term "occurrence" was ambiguous. In both *Lewellen* and *Heckadon*, we concluded that the terms of the policies, including "occurrence," are not ambiguous, and we are bound by that determination here. Thus, applying the plain meaning of "occurrence," "[t]he determinative inquiry . . . is whether *the insured* foresaw or expected the injury or damages." *Heckadon*, 586 S.W.3d at 801 (quoting *Lewellen*, 574 S.W.3d at 262). "However, in reviewing the insured's foresight of these injuries we employ an objective standard—whether a reasonably prudent person would foresee this accident—instead of an analysis of Franklin's subjective intent or expectation." *Lewellen*, 574 S.W.3d at 262. "The question of whether harm was intended 'can be inferred from facts and circumstances surrounding an act.'" *Heckadon*, 586 S.W.3d at 802 (quoting *Truck Ins. Exch. v. Pickering*, 642 S.W.2d 113, 116 (Mo. App. W.D. 1982)).

Whether Franklin's actions are covered by the policies is determined by the facts established in the underlying MMPA action. *See McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. banc 1999) ("The duty to indemnify is determined by the facts as they are established at trial . . . . The insurer's duty to pay arises only after the suit by the third party is successful and the insurer becomes obligated to pay the resulting

judgment." (internal quotations and citations omitted)). "[T]he 'underlying judgment is conclusive in a later action on the indemnity contract as to those issues and questions necessarily determined in the underlying judgment.'" *Lewellen*, 574 S.W.3d at 262-63 (quoting *Allen v. Bryers*, 512 S.W.3d 17, 33 (Mo. banc 2016)).

In the underlying MMPA action, the Overbeys introduced evidence that Franklin falsely inflated the price of the car they purchased; Franklin charged them $33,995 for a car that was worth $19,995. Franklin then added a $500 membership fee, a $499.95 document fee, a $599 gap insurance fee, and a $1,400 extended warranty fee. When the Overbeys expressed concern about the loan amount, Franklin repeatedly told them not to worry about it because the loan amount was immaterial since the program called for them to return the car in six months, permitting Franklin to convince the Overbeys that, with the promised funds from NAS, they would be responsible for only $49 per month. But, when the Overbeys returned to NAS six months later, Chad Franklin and NAS denied knowledge of the deal and informed the Overbeys that they were responsible for the full loan amount. Through this evidence, the Overbeys established that Franklin intentionally lured them into an elaborate and inherently fraudulent scheme that foreseeably caused them financial harm.

As was the case in both *Lewellen* and *Heckadon*, the evidence and arguments offered by the Overbeys in the underlying MMPA action were not limited to the conduct that harmed them. To show the scope of Franklin's deception, the Overbeys introduced testimony from Shelly Land, an investigator with the Missouri Attorney General's Office, who testified that her office had received 73 complaints about Franklin, 35 of which dealt with financing. The Overbeys also offered the testimony of four other NAS customers who said they had been misled by Franklin or its agents. The witnesses all characterized Franklin's actions as dishonest, and one directly

13

accused Franklin of lying. This evidence "show[s] that Franklin repeatedly and intentionally used deceptive business practices in furtherance of a complex, fraudulent scheme." *Heckadon*, 586 S.W.3d at 802. Franklin "targeted financially vulnerable, low income individuals to induce them to purchase cars at falsely inflated prices, financed by onerous loans based on the fiction that they would not be obligated to pay those loans." *Id.* at 803. Collectively, the evidence offered by the Overbeys showed that Franklin engaged in a pattern and practice of such behavior, and the injury they suffered was not isolated and did not result from negligence.

Like the Heckadons, the Overbeys argue that, because the MMPA does not contain a scienter requirement for civil liability, the underlying MMPA action did not establish that Franklin acted intentionally or, more particularly, that a reasonably prudent person in Franklin's position would have foreseen or expected the harm. However, as this court found in *Heckadon*,

> [e]ven if we were to find that the actual damages awarded did not, in and of itself, establish intentional acts, the jury's assessment of punitive damages, and the legal arguments and evidence . . . that established the right of submission of punitive damages to the jury, did establish that Franklin's actions were intentional.

*Id.* at 803. "It is difficult to envisage a scenario where an affirmative verdict does not incorporate such a finding." *Id.*

> More importantly, it remained the [plaintiffs'] burden to prove that coverage applied[, i.e.,] that the acts of Franklin were a covered occurrence. Through the evidence, pleadings, and argument they presented in the [o]riginal MMPA [a]ction, the [plaintiffs] have asserted repeatedly that Franklin acted intentionally[,] and they presented no substantial evidence to the contrary at the bench trial.

*Id.* The same is true in this case. Thus, the evidence presented in the MMPA trial demonstrated that the Overbeys' injuries were objectively foreseeable and expected.

As was the case in *Lewellen*, the punitive damages instruction provided to the jury at the MMPA trial was modeled on Missouri Approved Instruction (MAI) 10.01 [2008 Revision] Outrageous Conduct—Intentional Torts. MAI 10.01 [Revision 2008] provided, in relevant part,

14

If you find the issues in favor of plaintiff, and if you believe the conduct of defendant as submitted in Instruction Number _____ . . . was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number _____ . . . , you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.

The Overbeys argue that, because the instruction permitted the jury to award punitive damages based on a finding of evil motive *or* reckless indifference and the latter is not intentional, the jury's verdict does not demonstrate a finding that Franklin acted intentionally. But the Overbeys carry the burden of proving coverage, i.e., that Franklin's conduct constituted an "occurrence." *Heckadon*, 586 S.W.3d at 803. The Overbeys have not identified any evidence in the record that would support a finding that Franklin acted with reckless indifference. Thus, they did not establish that there was substantial evidence in the record to support the conclusion that Franklin's conduct was an "accident . . . which resulted in [an injury that was] neither intended nor expected from the standpoint of a reasonably prudent person."

On appeal, the Overbeys argue that the testimony of victims of the "Drive for Life" promotion regarding Franklin's conduct was based on hindsight and was not reliable evidence of Franklin's intent at the time of the sales. But there is rarely direct evidence of intent and "[t]he question of whether harm was intended 'can be inferred from facts and circumstances surrounding an act.'" *Id*. at 802 (quoting *Truck Ins. Exch.*, 642 S.W.2d at 116).

It is also relevant that, as noted by this court in *Lewellen*, at the time of the MMPA trial, the Notes on Use that accompanied MAI 10.01 limited its use to claims of intentional torts. *See* Notes on Use [2008 Revision] to MAI 10.01 ("Where the claim for actual damages is submitted on negligence as opposed to an intentional tort, MAI 10.01 is not applicable; use MAI 10.02 or MAI 10.07, whichever is appropriate."); *see Lewellen*, 574 S.W.3d at 263. Thus, the instruction

submitted to the jury to enable them to award punitive damages was the instruction for intentional torts. The Overbeys point to the subsequent adoption of MAI 39.01 [New 2014] Verdict Director - Violations of MMPA, which does not include a scienter component, but MAI 39.01 was adopted after the MMPA trial and, thus, is not relevant here.

Finally, when the Missouri Supreme Court examined the constitutionality of the state's punitive damages statute to uphold the award of punitive damages following the MMPA trial, the Court concluded that the underlying MMPA judgment

> is fully supported by the evidence that [Chad Franklin and NAS] . . . committed fraud in falsely representing to the Overbeys (and making similar representations to others) that they would owe only $49 per month if they joined a membership program for $500, but in fact the contract they signed obligated them to pay more than $37,000 over six years.

*Est. of Overbey*, 361 S.W.3d at 369. The Overbeys argue that the Court's characterization of Franklin's conduct as fraudulent does not accurately reflect the jury's verdicts in the MMPA trial. For the reasons discussed above, we disagree. The Overbeys also argue that the Court's factual findings are not binding in the present proceedings. But we find the Court's description of the facts to be relevant to the issues presented in this case.

As for *Lewellen* and *Heckadon*, the Overbeys appear to argue both that those cases were wrongly decided and that they are distinguishable. The Overbeys appear to challenge the sufficiency of the evidence and the legal reasoning in both cases. We reject the Overbeys' invitation to overturn those cases and, thus, we will focus on their attempt to distinguish the holdings in *Lewellen* and *Heckadon*.

The Overbeys argue that *Lewellen* is distinguishable because that case involved a fraudulent misrepresentation claim *in addition to* an MMPA claim. And they contend that *Heckadon* is distinguishable because Chad Franklin testified in the underlying action and did not

16

attempt to explain his actions or show remorse. Also, when Chad Franklin asserted his Fifth Amendment right not to incriminate himself, the jury was allowed to draw an adverse inference.

We are not persuaded by the Overbeys' arguments with respect to either *Lewellen* or *Heckadon*. Distinctions based on how evidence came in or other claims brought in those cases do not change the fact that all three cases involved the same underlying conduct, the same insurance policies, and the question of coverage for MMPA violations. Nor do the Overbeys' allegations change the fact that they failed to bear the burden of proving that the substantive evidence presented in the MMPA trial supported a finding that Franklin's conduct constituted an occurrence. The evidence presented and the legal analysis employed in both *Lewellen* and *Heckadon* are similar enough to the present case that the decisions in those cases are highly relevant to our analysis here.[16]

As we stated in *Heckadon*,

[i]t is inconsistent to assert on the one hand that the actions of Franklin merited the imposition of punitive damages based on evidence that they had defrauded [numerous] customers with an elaborate and long running scheme *and* to maintain that the award of punitive damages did not constitute a finding that Franklin had acted intentionally.

*Heckadon*, 586 S.W.3d at 805. The Overbeys "cannot now contend that Franklin's elaborate scheme was not dishonest or [that it was] the result of mere negligence[,] and they have presented no substantial evidence that the events giving rise to the judgment in the [o]riginal MMPA [a]ction were a covered occurrence (an accident) under the Universal polic[ies]." *Id.*; *see also Lewellen*, 574 S.W.3d at 263 (Lewellen "plainly chose[] to advance the theory of an intentional act," and "it

---

[16] The Overbeys also urge us to follow our per curiam decision in *Kates v. Universal Underwriters Insurance Co.*, 348 S.W.3d 115 (Mo. App. W.D. 2011), yet another "Drive for Life" case, but *Kates* is an unpublished decision, which has no precedential authority. *Zygler v. Hawkins Constr.*, 609 S.W.3d 61, 68 n.3 (Mo. App. E.D. 2020) ("Unpublished opinions . . . are neither binding nor persuasive precedent in this Court.").

was only during the equitable garnishment proceeding, when it became clear that asserting an intentional tort would harm her interests, that Lewellen reasserted her negligence claim.").

Because the policy definition of "occurrence" was not ambiguous, because that definition did not include intentional conduct that foreseeably caused financial harm, and because the evidence presented in the MMPA action showed that Franklin's actions were intentional and the harm was reasonably foreseeable, the Overbeys failed to meet their burden of showing that Franklin's conduct met the definition of an occurrence; therefore, Universal's policies did not afford coverage for Franklin's conduct.

Point I is granted.[17]    Our disposition of Point I makes it unnecessary for us to address Point II (applicability of policy exclusions) or Point III (insurability of punitive damages).

## Conclusion

The judgment finding coverage under Universal's policies for damages awarded on the Overbeys' MMPA claims is reversed.

Karen King Mitchell, Judge

Mark D. Pfeiffer, Presiding Judge, and Gary D. Witt, Judge, concur.

---

[17] As we stated in *Heckadon*,

> [w]e do not go so far as to hold that the assessment of punitive damages is equivalent to a jury finding of intent in all cases. However, where, as is the case here, the evidence and sole legal theory enabling the grant of such a proportionally large award in the [underlying] MMPA [a]ction was that the defendant engaged in a pattern of intentionally fraudulent misconduct, the imposition of liability (particularly for punitive damages) established that Franklin's actions were intentional.

*Heckadon v. Underwriters Inc. Co.*, 586 S.W.3d 789, 804 (Mo. App. W.D. 2019).